In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2290

PAULA JACKSON,

*Plaintiff-Appellant,*

*v.*

INDIAN PRAIRIE SCHOOL DISTRICT 204, ET AL.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:08-CV-04312—**Amy J. St. Eve**, *Judge.*

ARGUED FEBRUARY 11, 2011—DECIDED AUGUST 11, 2011

Before BAUER, POSNER, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* Paula Jackson is a special education support teacher for the Indian Prairie School District, where she is responsible for helping the general population teachers educate certain disabled students. One of the students assigned to Jackson was W.K., who had been diagnosed with autism. W.K. had a long history of verbal and physical outbursts, including hitting and scratching himself, other students,

and teachers. He would also swing or throw objects, including chairs. Multiple teachers and administrators recommended that W.K. be transferred to a therapeutic day school that was better suited to address his unique needs, but the district let W.K. stay at his regularly assigned general education public school.

W.K. had another one of his frequent outbursts during the spring of his fourth grade year. The principal of the school went to W.K.'s "classroom," which, at that point, was a solitary room with one teacher where W.K. was the only student. The principal left the room after concluding that W.K. had calmed down. Shortly after the principal left the room he saw Jackson. He told her about W.K.'s outburst and said that he wanted her to "go upstairs . . . and talk it over with [W.K.]." Jackson went to W.K.'s room and found that he was again in an agitated state. W.K. tried to throw a chair, Jackson tried to stop him, and W.K. injured Jackson as a result.

Jackson filed a complaint against the school district and four of its administrators, asserting that her constitutional rights were violated because she was ordered to W.K.'s room even though he was known to be violent, and because W.K. should have been previously transferred to an alternative school. The defendants moved for summary judgment, and the district court granted the defendants' motion. Because we conclude that the district's actions were flawed and short-sighted, but do not "shock the conscience" as is required to maintain Jackson's substantive due process claim, we affirm the decision of the district court.

## I. BACKGROUND

Paula Jackson became a special education support teacher for Indian Prairie School District 204 in 2002. The district operates 33 schools, serves approximately 28,700 students, and employs approximately 3,100 employees. White Eagle Elementary is one of the district's schools. In 2005 the district assigned Jackson to White Eagle. In her role as a special education support teacher, Jackson was tasked with aiding the general education teachers by providing enhanced support for students who qualified for special programming due to a mental or physical disability. Jackson, who had assumed tenured status by the time she brought this case, had been previously assigned to two different schools within the district and had taught over 100 students.

At the time Jackson was assigned to White Eagle, W.K. was a second-grade student, and had been enrolled since kindergarten. Jackson "immediately saw that W.K. was extremely troubled and prone to erratic and violent behavior." On the first day of the 2005-2006 school year, when W.K. was seven years old, his mother dropped him off in front of the school. W.K. chased after his mother's car as she tried to drive away. Jackson wanted to stop him from running into the street so she tried to physically move him back to the school grounds. As she was doing so, W.K. began to kick, punch, and bite her. He stopped only when White Eagle's principal, Ronald Zeman, pulled him away. Principal Zeman brought W.K. into a private room at the school and

thought that he had successfully calmed him down. But then, "out of the blue [W.K.] just started flailing at [Principal Zeman] . . . trying to hit me with any part of his body or object he could get his hands on. . . . He was trying to hit, punch, kick." He also tried to headbutt Principal Zeman. Although Principal Zeman was able to restrain him, he later noted that "[W.K.] is a strong kid." W.K. was suspended after this incident, but he was not expelled from White Eagle.

On April 12, 2006, district administrators held an Individual Education Plan (IEP) meeting regarding W.K. W.K.'s parents requested the meeting because of "ongoing behavioral concerns. . . . [W.K.] has difficulty with impulse control and . . . difficulty handling frustration." Thirteen people were present at the meeting, including Jackson, Principal Zeman, W.K.'s parents, a social worker, the school nurse, and the student services coordinator. A report was created in preparation for the meeting that detailed W.K.'s eight incidents of aggression towards staff and seven incidents towards other students. Among other acts he had "pushed student, refused time out," "stabbed student in back with pencil," and "threw paper/pushed papers at teacher; called teacher idiot." It was noted that "[W.K.] struggles at times with impulsive reactions to situations he finds frustrating, unexpected, or unchosen," and that "when [W.K.] has an explosive incident, it is often impulsive and unexpected." During the meeting the participants discussed various educational programs and placement options for W.K. "Alternative Education Program" was rejected as "not applicable." "Supported Placement in

General Education Classroom" was selected because it "best meets needs." Jackson was assigned as W.K.'s special education support teacher and became responsible for assisting W.K's general education teacher. The district held another IEP conference regarding W.K. on June 1, 2006, where it was noted that W.K. was presently in supported education and that the evaluation team would meet again in the fall to review an outside evaluation.

W.K. returned to White Eagle for the third grade, the 2006-2007 school year. The district held an IEP conference for him on September 6, 2006. The report noted that W.K. was eligible for special education services under the "autism" disability category, based on his diagnosis of Asperger's Syndrome. It was decided that W.K.'s appropriate educational placement was in supported general education, and Jackson was again assigned as his support teacher. The report noted that "[W.K.'s] disability affects his ability to self-regulate." Additional IEP conferences regarding W.K. were held on November 16, 2006 and February 9, 2007. Throughout this time Jackson expressed frustration at W.K.'s disruptive and belligerent behavior, such as his hitting and scratching himself, and hitting, scratching, kicking, and throwing objects at other students and teachers, including her. Jackson stated that "at some point, [W.K.'s] violent outbursts became so common that his teachers stopped documenting each such occurrence." But there were numerous times that W.K.'s violent outbursts were documented, such as a February 22, 2007 incident where W.K. was suspended after he hit a social worker in the eye,

knocking her contact lens out. And at some point during W.K.'s third-grade year Principal Zeman received an anonymous letter. The letter stated that it was from parents of students who had to attend class with W.K. The letter stated that W.K. was a danger and that if he was not removed from the school they would seek legal counsel. Principal Zeman discussed the letter with the then-superintendent of the school (who is a defendant in this case). The superintendent did not act in response to the letter.

In March of 2007 Jackson went to Principal Zeman's office and asked that a different support teacher be assigned to W.K. She stated that "I couldn't handle it anymore . . . [W.K.] needs to be off my case load." Principal Zeman did not want to transfer W.K. because of the time it would take for W.K. to adjust to a new special education support teacher. Jackson "was very upset" and said "it's not fair," but W.K. was not reassigned.

The district held another IEP conference for W.K. on May 23, 2007. There were fourteen people present at the conference, including Jackson, Principal Zeman, W.K.'s parents, and W.K.'s parents' attorney. During the meeting W.K.'s violent episodes were noted and documented. For example, in the time period between April 5, 2007 and May 18, 2007, W.K. had 34 verbal outbursts and 36 physical outbursts. He was also averaging 2.6 "incidents" (defined as "any act of verbal or physical aggression toward person, property, or self") a day.

Under the "Recommended Educational Services" section of the IEP report, the option for "Supported Place-

ment in General Education Classroom" was selected for the time period of June 8, 2007 to June 8, 2008 because it "best meets need [for] high level of support and structure in least restrictive environment." However, the conference participants also discussed the option of placing W.K. in an alternative school, and every person present, with the exception of W.K.'s parents and their attorney, recommended that W.K. be transferred to a therapeutic day school. The school "staff expressed concern about the lack of progress on skills and goals as well as the emotional needs observed on a daily basis. [Jackson] expressed concern regarding [W.K.'s] ability to cope and develop." But W.K.'s parents "expressed concern about the impact of [W.K.] being away from his peers and home school. They see him interacting with friends in the neighborhood."

The May 23 meeting was ultimately suspended before a placement decision for W.K. could be finalized, although the parties dispute why. Jackson contends that the parents' attorney asked that the conference be paused so he could have time to convince the parents to transfer W.K. to an alternative school. The defendants contend that W.K.'s father and the attorney asked that the meeting be postponed because W.K.'s mother had to leave the meeting early, and they wanted her present for any discussion regarding W.K.'s educational placement. They also note that W.K.'s parents wanted time to obtain recommendations from an outside consultant, and visit a therapeutic day school. In any event, the decision was made to suspend the IEP conference for approximately two weeks to June 8, 2007.

Shortly after the May 23 conference was discontinued, Principal Zeman met with the Assistant Superintendent of Student Services and a Student Services Supervisor for the district (both are defendants in this case). They advised Principal Zeman not to follow the recommendation of the IEP team to transfer W.K. to an alternative school. They had "compiled . . . multiple data points ranging from incidences of verbal aggression, physical aggression, which were our two main concerns . . . [and] the data showed a line of improvement and that it would not make for a good case for putting this child in an alternative educational placement." Principal Zeman did not agree with their position because compared to other children at White Eagle, W.K.'s behavior was "off the charts," and he "was not positive" that keeping W.K. at White Eagle "was a good idea" because "we did not have the ability to meet his needs."

W.K.'s IEP conference reconvened on June 8, and the participants discussed the option of placing W.K. in an alternative school. W.K.'s mother stated that she had visited the therapeutic school and "felt depressed going in, small classrooms with desks close together." The staff discussed W.K.'s problems at White Eagle, including his "disrespect to his teaching assistants—it had tended to escalate when ignored." At some point during the conference a school official stated that W.K. would be allowed to return to White Eagle for the following school year, and Jackson was "incensed." She was "mad that . . . they had already made that recommendation without the team's input." The meeting continued as various participants suggested strategies

for W.K.'s next school year, including modifying the programming and transition activities in his behavioral support plan.

W.K. returned to White Eagle for the 2007-2008 school year. He was nine years old and in the fourth grade. Jackson was again named as his special education support teacher. Changes to W.K.'s behavioral support plan included designating a solitary room that the school referred to as his "office." Based on what was appropriate at the time, Jackson or a social worker would place W.K. either in his general education class or his self-contained office. The school held an IEP conference for W.K. on October 25, 2007. During this meeting "significant points/trends were discussed—total incidents are down . . . and have shifted to more verbal than physical." Commentary for W.K.'s "comprehensive data" chart, which tallied W.K.'s acts of aggression, noted that "physical [incidents] greatly reduced 1.3 to .5. Percentages indicate more verbal outbursts than physical now." But there were still numerous documented examples of W.K. being abusive towards himself (such as purposefully bumping into walls) and acting aggressively towards others. For example, on January 30, 2008, after a teaching assistant told W.K. that he had to wait for physical education class, W.K. punched the assistant in the arm, threw a chair at her, and kicked her in the shin. On February 6, 2008, W.K. kicked Jackson in the hand, leading Jackson to seek treatment from the school nurse. And on February 27, 2008, W.K. threw papers, blocks, and a laptop, and kicked his teaching assistant.

The district held another IEP conference for W.K. on March 4, 2008. The corresponding report detailed W.K.'s outbursts during the 2007-2008 school year: the staff had reported 11 incidents of physical assaults against them, filed four injury incident reports, and W.K. had 61 "office interventions." Principal Zeman noted that W.K. "appears to hold onto anger," and that the "team feels we are not meeting [W.K.'s] needs." The staff "reported that [W.K.] needs a lot," and that they had "seen improvements, but still has concerns." Jackson voiced her opinion that W.K. should be immediately transferred to a therapeutic day school. The district did not transfer W.K.

A little more than a week after the March 4 IEP conference, on March 13, 2008, W.K. had another outburst. He was in his office doing work when he became frustrated. He began throwing objects around the room and at his teaching assistant. The assistant called Principal Zeman to the room. Principal Zeman spoke with W.K., and then left the room after he felt that W.K. had calmed down. Shortly after leaving the room he saw Jackson, told her about W.K.'s outburst, and said "I want you to go upstairs, and . . . talk it over with [W.K.]." Jackson went to the room and saw that W.K.'s emotional state had escalated, and he was again agitated. At some point he picked up a chair and swung it at Jackson, who raised her hands to protect herself. She grabbed the legs of the chair, a struggle ensued, and Jackson fell backward. She hit her head on the white board and her neck on the chalk ledge of the board. Principal Zeman came back to the room and drove Jackson to a medical facility.

Jackson later filed a worker's compensation claim, and has received payments for her medical expenses under that claim.

W.K. was suspended because of the March 13 incident. During the suspension White Eagle gave notice to W.K.'s parents that a recommendation was being made to transfer W.K. to an alternative school. The recommendation was "based on the serious bodily injury incurred by a White Eagle staff member as a result of the [March 13] event." Another IEP conference was scheduled for March 26, and W.K. was not allowed to return to White Eagle until after the conference. Fifteen people were present at the March 26 conference, including Jackson, Principal Zeman, W.K.'s parents, W.K.'s parents' lawyer, and a lawyer for the school district. On the educational placement selection form, "Requires a placement in an alternative education setting" was selected. W.K. was placed in an alternative school for the remainder of the year, and his parents did not attempt to re-enroll him at White Eagle for the following year. Jackson stayed at White Eagle, and remains employed by the district as a full-time, tenured, special education support teacher.

Jackson brought suit against the school district and four of its administrators, not including Principal Zeman, under 42 U.S.C. § 1983. The complaint alleges violations of Jackson's constitutional right to substantive due process. The defendants eventually moved for summary judgment, which the court granted, finding that there was no basis in the record that the defendants'

actions satisfied the standard for finding a constitutional violation. This appeal followed.

## II. ANALYSIS

Jackson's complaint pursuant to § 1983 alleged that the state-actor defendants deprived her of her constitutional rights by knowingly creating and increasing a danger to her. *See London v. RBS Citizens, N.A.*, 600 F.3d 742, 745-46 (7th Cir. 2010) (in order to state a § 1983 claim, a plaintiff must sufficiently allege that: (1) a person acting under color of state law (2) deprived her of a right, privilege, or immunity secured by the United States Constitution or laws). After discovery the district court granted summary judgment in favor of the defendants, finding that their conduct did not "shock the conscience" as is required to sustain a claim for a violation of substantive due process under a state-created danger theory. We agree that the defendants' conduct does not satisfy the high standard for finding a violation of substantive due process, and affirm the decision of the district court.

We review a district court's order granting summary judgment de novo. *Walker v. Sheahan*, 526 F.3d 973, 976 (7th Cir. 2008). We construe all facts and reasonable inferences in favor of the non-moving party. *Marion v. City of Corydon, Indiana*, 559 F.3d 700, 704 (7th Cir. 2009). Summary judgment is appropriate where the pleadings, discovery, disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Estate of Suskovich v.*

*Anthem Health Plans of Virginia, Inc.*, 553 F.3d 559, 563 (7th Cir. 2009). In a § 1983 case, the plaintiff bears the burden of proof regarding the claimed constitutional violation, and must present sufficient evidence to create genuine issues of material fact to avoid summary judgment. *Sow v. Fortville Police Dep't, et al.*, 636 F.3d 293, 300 (7th Cir. 2011).

Jackson faces a difficult road in meeting her burden of showing that the facts of her case suffice to constitute a constitutional deprivation. The Due Process Clause of the Fourteenth Amendment "generally does not impose upon the state a duty to protect individuals from harm by private actors." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009). However, there are two exceptions to this general rule. The first arises when a state has custody over a person. In that instance, the state is obligated to offer protection because no alternative avenues of aid exist. *Id.* The second exception comes into play "when the state affirmatively places a particular individual in a position of danger the individual would not otherwise have faced." *Id.* This second exception is known as the state-created danger doctrine, and it is the basis on which Jackson advances her claim.

To establish a substantive due process claim under a state-created danger theory, Jackson must demonstrate that: (1) the district, by its affirmative acts, created or increased a danger that Jackson faced; (2) the district's failure to protect her from danger was the proximate cause of her injuries; and (3) the district's failure to

protect her "shocks the conscience." *King ex rel. King v. East St. Louis School Dist. 189*, 496 F.3d 812, 817-18 (7th Cir. 2007). The defendants contend that Jackson's claim fails under all three prongs of this test. They argue that Jackson voluntarily chose to teach disabled children, including those with autism, and that the district's actions do not shock the conscience. They note the district's legal obligations under the Individuals with Disabilities Education Act (IDEA), which mandates that school districts ensure "access to the general education curriculum in the regular classroom, to the maximum extent possible." 20 U.S.C. § 1400(c)(5)(A); *Hunt v. Sycamore Community School Dist. Bd. of Educ.*, 542 F.3d 529, 544-45 (6th Cir. 2008) (even if district failed to protect teacher from special education student with a history of violent assaults, injured teacher's § 1983 claim fails because teacher voluntarily undertook hazardous employment and district had duty under IDEA to educate child). Here, although we question whether Jackson can satisfy the first prong of the test, *see Sandage v. Board of Comm'rs of Vanderburgh County*, 548 F.3d 595, 599 (7th Cir. 2008) (noting the "essential distinction between endangering and failing to protect"), we will address whether the defendants' actions "shock the conscience" only, since Jackson's claim falls short under this dispositive prong.

The Supreme Court has held that state action that shocks the conscience is conduct which may be deemed "arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (citation omitted). Only "the most egregious official conduct" will

satisfy this stringent inquiry. *Id*. Making a bad decision, or even acting negligently, does not suffice to establish the type of conscience-shocking behavior that results in a constitutional violation. *See id*. at 849 ("conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."). We have previously noted that while the "shocks the conscience" standard lacks precise measurement, only conduct falling towards the more culpable end of the tort law spectrum of liability will be found to shock the conscience. *King ex rel. King*, 496 F.3d at 818-19; *see also DeShaney v. Winnebago County Dep't of Social Services*, 489 U.S. 189, 202 (1989) (not every tort committed by a state actor is a constitutional violation). Where, as here, public officials have time for reasoned deliberation in their decisions, the officials' conduct will only be deemed conscious shocking when it "evinces a deliberate indifference to the rights of the individual." *King ex rel. King*, 496 F.3d at 819. And because the state actor's conduct is evaluated along a spectrum of culpability, any analysis of potentially conscious-shocking behavior is necessarily fact-driven. *Id*. at 818. In this case, although this is a close question, we ultimately conclude that the facts present do not allow a finding that the defendants' conduct shocks the conscience.

The factors falling in favor of finding that the defendants' actions shock the conscience are the following: W.K.'s outbursts were frequent—the record is replete with noted occurrences of W.K. hitting, kicking, scratching, and throwing objects. The district was

certainly aware that W.K. was prone to acts of violence, and was fully aware that W.K. had harmed teachers in the past. W.K.'s bouts of physical aggression were often unexpected, unpredictable, and "out of the blue." No one could be sure exactly when W.K. would have an outburst, or what would trigger it, creating a precarious environment for all who were around him. Even though W.K. was a child, Principal Zeman and Jackson considered him to be strong. And Principal Zeman said that he wanted Jackson to go to W.K.'s room even though he knew W.K. was either in the midst of a violent outburst, or had recently de-escalated from one. Jackson asserts that these factors, combined with the district's decision not to transfer W.K. from White Eagle, suffice to allow her § 1983 claim to survive summary judgment. *See, e.g., White v. Rochford*, 592 F.2d 381, 385-86 (7th Cir. 1979) (district court's dismissal of complaint alleging § 1983 violation reversed where police officers left children alone in a car on a cold night after arresting the car's driver, resulting in mental and physical damage to the children); *Reed v. Gardner*, 986 F.2d 1122, 1126-27 (7th Cir. 1993) (district court's dismissal of complaint alleging § 1983 violation reversed where police officers arrested original driver of a car, leaving a drunk passenger behind who later caused a head-on collision); *Monfils v. Taylor*, 165 F.3d 511, 520 (7th Cir. 1998) (evidence before jury was sufficient to find constitutional violation where officers released identifiable voice recording of informant who was later murdered).

However, the factors falling in favor of finding that the defendants' actions do not shock the conscience are

the following: the record shows that many of W.K.'s acts of violence were not against other people, but were against himself, by, for example, intentionally running into walls. The IEP evaluation reports describe the staff members as expressing concern that they were not meeting W.K.'s needs, that he was incredibly needy and disrespectful, and that he was failing to advance, but not that they were in fear of his harming them. The district held regular evaluations of W.K. where it was noted that his total incidents were down, and that he was showing a trend towards verbal, rather than physical, outbursts. Principal Zeman went to W.K.'s room before he asked Jackson to talk to W.K. about his outburst, and Principal Zeman did not leave the room until after he felt that W.K. had calmed down. And every IEP evaluation report, except for the report created after the March 13 incident where W.K. injured Jackson, recommended that the educational setting that best met W.K.'s needs was supported education in a general educational classroom. Without these critical factors, the district's decision not to transfer W.K. could be seen as an implicit acceptance of, and a deliberate indifference to, violence towards its teachers and staff, which could satisfy the standard for finding a constitutional violation. *King ex rel. King*, 496 F.3d at 819. *But see Walker v. Rowe*, 791 F.2d 507, 510-11 (7th Cir. 1986) (due process clause does not assure safe working conditions for public employees). As the unique facts of this case stand, although the defendants' actions may well have been short-sighted, flawed, negligent, and tortious, they do not satisfy the standard for finding a constitutional violation. *County of*

*Sacramento*, 523 U.S. at 848; *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 129 (1992) (the due process clause is not a guarantee against incorrect or ill-advised personnel decisions by state actors).

We do not lightly reach the conclusion that the defendants' conduct does not shock the conscience. We are cognizant of the school district's stated policy requirement to "at all times take necessary measures to protect all employees from physical or psychological harm." And education professionals who take on the extraordinary task of teaching children in public schools, including those who choose to teach children with disabilities, should not also be expected to endure frequent and unpredictable acts of violence. We emphasize that at no time is it necessary for a student to inflict serious bodily harm on a teacher before a school is justified in deciding that a general education classroom is not the appropriate forum for a certain disabled student. But a "shocks the conscience" analysis is necessarily a fact-driven one, and here, we cannot say that the decision of the district not to transfer W.K. before the March 13 incident was the type of egregious act that constituted a constitutional violation of Jackson's rights.

Because we conclude that Jackson's constitutional rights were not violated we will not address the additional issues she briefed on appeal, specifically, that Principal Zeman's directive was attributable to a school board policy; that the district's failure to train was a cause of Jackson's injuries; that the non-district defendants are not entitled to qualified immunity; and

that the defendants' policies and practices proximately caused Jackson's injuries.

## III. CONCLUSION

The decision of the district court is AFFIRMED.