POSNER, Circuit Judge.
The plaintiff, a prison inmate, filed suit under 42 U.S.C. § 1983 against two Mari-nette County (Wisconsin) Sheriffs Department detectives, accusing them of having arrested him in violation of his Fourth Amendment rights. He seeks $25,000 in compensatory and $50,000 in punitive damages for the arrest and accompanying detention, seizure of personal property that he claims was worth $10,000, and infliction of emotional distress.
He had committed an ugly home robbery in 2005 and been arrested nine days later in the apartment of a girlfriend, later his fiancée, Stacy Thede. Convicted in a Wisconsin state court of armed robbery, armed burglary, battery, theft of moveable property, mistreatment of an animal resulting in the animal’s (a dog’s) death, and false imprisonment, he was sentenced to 40 years in prison to be followed by 18 years of extended supervision.
In the present case, the civil case, the defendant officers moved for summary judgment on the ground that Thede had consented to their entry into the apartment, where they had discovered and arrested Cook. When asked at Cook’s criminal trial whether she’d “let them [the officers] in,” Thede had testified ‘Tes,” but in the civil case she submitted an affidavit which states that when she had testified that she “let them in” she had meant that she “did not tell them to leave or did not object directly to them, but let them remain.” The district court granted summary judgment for the officers on the basis of their defense of consent, rejecting Thede’s affidavit as inconsistent with her testimony at the criminal trial.
The two detectives from Marinette County, accompanied by two officers from the Sheboygan City Police Department who are not defendants in Cook’s suit, had *298 arrived at Thede’s apartment house at about 11:00 a.m. on May 31, 2005. The apartment house was in Sheboygan, though the robbery had occurred in Pesh-tigo, in Marinette County in northeastern Wisconsin, more than 150 miles from She-boygan. That’s why the detectives were from Marinette County but the other officers were from Sheboygan — they would be familiar with the city and provide security for the detectives.
The detectives wanted to talk to Thede because they’d discovered that Cook’s robbery accomplice had been carrying a cellphone when he was arrested and a search of the cellphone had revealed calls to a phone registered to Thede. According to their affidavits, the detectives thought the cellphone might have been used by the other suspect (who turned out to be Cook) on the night of the robbery. At the time, the detectives did not know that suspect’s legal name but knew that he went by “BN” (short for “Bad News”) and by “Rex,” since a witness had reported obtaining gloves 'and duct tape for “BN” (also known as “Rex”) and driving with him to and from the robbery site.
The detectives buzzed for Thede at the building entrance. In response, without asking who they were, she pushed the button in her apartment that enabled entry to the building and met them in the hallway outside the apartment. Explaining that they needed to ask her some questions, they asked her whether there was anyone in the apartment. According to Thede and some contemporary police reports (including the report of one of the two Marinette detectives), she said yes, “a friend.” According to the other detective, and to a later affidavit by the detective whose initial report had said that Thede had not named her friend, she had told them that “News” was in the apartment.
Thede asked the detectives in the hall whether she could reenter her apartment and change out of her pajamas before talking further with them. They said she could. She reentered, and either closed the door to the apartment or left it ajar. The officers opened the door (or if it was already slightly open, opened it further) in order to be able to see into the apartment. They heard her talking to someone in another room, and while standing in the doorway without as yet having entered the apartment they yelled that she should bring the person she was talking to (who was Cook, with whom she was talking in a bedroom) into the living room where the officers could see him. When he appeared, they recognized him as the robbery suspect. They then entered the apartment. Within minutes the Sheboy-gan police officers arrested him after a warrant check revealed an outstanding arrest warrant against him for violating parole.
The district court refused to consider Thede’s affidavit, which we mentioned earlier, as evidence in this case on the ground that it was a “sham.” A “sham affidavit” is an affidavit that is inadmissible because it contradicts the affiant’s previous testimony (here, testimony Thede had given in the criminal prosecution of Cook) unless the earlier testimony was ambiguous, confusing, or the result of a memory lapse. Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 759 (7th Cir.2006); Bank of Illinois v. Allied, Signal Safety Restraint Systems, 75 F.3d 1162, 1168-71 (7th Cir.1996). Thede’s affidavit was amplification rather than contradiction, and so was not within the “sham” exclusionary rule. But the affidavit doesn’t help Cook’s case. It acknowledges that Thede agreed to speak with the officers, and although it says that she agreed to speak with them in the hallway it must have been obvious to *299 her that the conversation was more likely to take place in the apartment than in the hallway outside it. What reason would she have to talk to four police officers in a public corridor&emdash;-except to conceal Cook? But whether she consented to talk to them only in the hallway is irrelevant, because no conversation took place; it would have been about Cook’s whereabouts, which the officers discovered the moment they saw him. Thede’s affidavit was therefore inadmissible, though not because it was a sham affidavit but because it was irrelevant.
The officers' decision to hold open the door to the apaitment so that they could see into the living room while Thede was getting dressed elsewhere in the apartment was simple prudence and thus within the scope of the "exigent circumstances" (i.e., emergency) exception to the requirement of a warrant. See, e.g., Kentucky v. King, 563 U.S. 452, 131 S.Ct. 1849, 1856-63, 179 L.Ed.2d 865 (2011). Even if she didn't identify the "friend" in the apartment as "News" (a question on which the evidence is in conflict), given the connection, evidenced by cellphdne records, between her and Cook's accomplice, the "friend" in the apartment could well be "BN" (that is, Cook)-a violent, dangerous criminal, who might well be (though it turned out that he wasn't) armed and dangerous. Had the officers waited for Thede to get dressed and open the door to the apartment they might have found themselves six inches from the barrel of a gun. As in protective-sweep cases, the officers were justified in taking reasonable precautions to minimize the danger to themselves. Maryland v. Buie, 494 U.S. 325, 333-35, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Had they out of an abundance of caution instead removed themselves from potential danger, the suspect might have escaped. Compare Minnesota v. Olson, 495 U.S. 91, 100-01, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).
We thus needn’t decide whether, as the district court found, Thede consented to the officers’ entry into her apartment. Their opening the door (without entering) was prudent' given the potential danger that the “friend” might pose. Once they saw him, they knew he was the suspect in the robbery that they were investigating, and it would be absurd to think that they should have turned and left and applied for a search warrant. Think of what might have ensued had they been required to run off to get a search warrant before they could lawfully enter the apartment and arrest Cook. As soon as they left to get the warrant he would have split. True, some of the four officers might have remained in the hallway (while the others went to get a search warrant) and followed Cook as he fled. But he might have shaken off the tail, and still be at large today. Once he had left the apartment and they recognized him as the robbery suspect, they would have had probable cause to arrest him (or at the least to stop him long enough to do a warrant check), and they could have done this without a search warrant because the hallway was a public space. But he might not have remained there. He might have outrun them. Moreover, Thede’s apartment was on the second floor; Cook could have jumped out of a back window and fled without being seen by any of the officers.
Cook’s lawyer makes much of the fact that when the police saw Cook, Thede became upset and the police pulled her into the hallway to prevent her from interfering with their conversation with Cook. We can’t see the relevance of this contretemps; Thede is not the plaintiff.
Now suppose Thede and Cook had been co-owners or co-occupants of. the *300 apartment and one or both of them had objected to entry by the police, and in addition that there had been no emergency justifying entry. Would that have changed the outcome of this case? No. The warrant to arrest Cook for violating parole is the key to this conclusion. The Supreme Court said in Payton v. New York, 445 U.S. 573, 602-03, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), “that an arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to interpose the magistrate’s determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen’s participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law. Thus, for Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.” That was a dictum, but a considered rather than a casual one, and the lower courts including our own have treated it as a rule. See, e.g., United States v. Jackson, 576 F.3d 465, 468-69 (7th Cir.2009); United States v. Thomas, 429 F.3d 282, 285-86 (D.C.Cir.2005); United States v. Hill, 649 F.3d 258, 262-64 (4th Cir.2011); United States v. Hardin, 539 F.3d 404, 423-24 (6th Cir.2008).
It’s true that the warrants involved in the Payton case were for felonies, whereas the warrant in our case was for a parole violation, which might not be a felony (the record is silent on this point). But persons on parole have a diminished right of privacy, because parole is a form of custody, and so an arrest warrant for violation of parole would entitle officers to enter the parolee’s home to arrest him. United States v. Pelletier, 469 F.3d 194, 200 (1st Cir.2006); see also United States v. Hollis, 780 F.3d 1064, 1068-69 (11th Cir.2015); United States v. Collins, 699 F.3d 1039, 1041-42 (8th Cir.2012); United States v. Thomas, supra, 429 F.3d at 285-86. Anyway Cook was not a resident of Thede’s apartment, and obviously the subject of an arrest warrant has no greater expectation of privacy if he is visiting someone rather than being at home. United States v. Jackson, supra, 576 F.3d at 467-68; see also United States v. Underwood, 717 F.2d 482, 484 (9th Cir.1983) (en banc).
The arrest warrant was all that the police needed in order to be justified in arresting Cook (setting to one side their justification based on an emergency situation). They didn’t know there was a warrant for his arrest, however, and we must consider whether that should matter. We think not, though not because of the “collective knowledge” doctrine, which allows an officer to stop, search, or arrest a suspect at the direction of his superiors even if the officer lacks firsthand knowledge of facts that would justify the action. See United States v. Hensley, 469 U.S. 221, 232-33, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985). The officers who arrested Cook had not been told to arrest him because of the warrant outstanding against him; had they been told, they could have arrested him lawfully without knowing the basis on which the warrant had been issued. But what they did in arresting Cook was exactly what they would have done had they known about the warrant. They did the right thing without knowing it was the right thing; and since they did the right thing Cook has no valid objection.
Suppose there are outstanding arrest warrants for two persons, X and Y. One police officer has the warrant for X; he doesn’t know there is a warrant outstand *301 ing for Y as well. The officer arrests Y, mistakenly thinking that he is X. Is that a false arrest? Or is it serendipity? It’s the latter, and should not be punished by awarding damages to Y. Cf. Patton v. Przybylsky 822 F.2d 697, 699-700 (7th Cir.1987). Notice the analogy to the “inevitable discovery” doctrine of Nix v. Williams, 467 U.S. 431, 443-44, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); see United States v. Witzlib, 796 F.3d 799, 800-02 (7th Cir.2015).
Officers who enter premises without reasonable belief that they will find the person for whom they have a warrant will still be liable when their quarry turns out not to be present, and that should be sufficient to discourage officers from entering homes when they have no basis to believe they’ll find the suspect there. But that is beside the point of the present case. The officers didn’t enter Thede’s apartment until they saw Cook and thus knew they’d found their suspect.
All this to one side, there is no basis for any of the damages that Cook seeks; and damages are the only relief that he does seek. “Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest.” Mustafa v. City of Chicago, 442 F.3d 544, 548 (7th Cir.2006). And that is when there’s no warrant — here there was one. Once Cook acknowledged to the officers that his. street names were “BN” and “Rex,” there was additional probable cause to arrest him for the robbery. As for damages for loss of personal property of Cook seized by the police and not returned, that property was seized after Thede, following Cook’s arrest, had consented to a search of the apartment. As it was her apartment, not Cook’s (he was not a joint tenant), she had authority to consent. As for damages for emotional distress caused by the entry of the police into the apartment, there is no basis for thinking that the arrest caused Cook more emotional distress than had the police entered clutching the arrest warrant. Given Cook’s recent commission of a violent robbery, moreover, it is hard to believe that the sight of police officers caused him emotional distress; he is not the sensitive plant of which Shelley wrote in a poem of that name: “A Sensitive Plant in a garden grew,/ And the young winds fed it with silver dew,/ And it opened its fan-like leaves to the light,/ And closed.them beneath the kisses of Night.”
Nominal or punitive damages are out of the question, too, given the arrest warrant. Any award of damages to Cook arising out of the entry of the police into the apartment that was not his would be a pure windfall. See Habitat Education Center v. U.S. Forest Service, 607 F.3d 453, 460-61 (7th Cir.2010); Hessel v. O’Hearn, 977 F.2d 299, 302-05 (7th Cir.1992).
The entry (if that is how peeking into the living room should be described) was justified by the need to protect the police officers from a possible assault by Cook; and at worst the entry was a harmless error because of the existence of the warrant and the absence of any possible entitlement to damages. The judgment for the defendants is therefore
AFFIRMED.