In the

# United States Court of Appeals
## For the Seventh Circuit

No. 23-1790

RODNEY CLEMONS,

*Plaintiff-Appellant,*

*v.*

WEXFORD HEALTH SOURCES, INC., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-cv-00132 — **Andrea R. Wood**, *Judge.*

ARGUED MAY 21, 2024 — DECIDED JULY 2, 2024

Before SCUDDER, ST. EVE, and KIRSCH, *Circuit Judges.*

ST. EVE, *Circuit Judge.* Rodney Clemons, an inmate at Stateville Correctional Center, injured his right ankle years before his incarceration. As a result, Clemons suffered pain in his right ankle and foot for several years while incarcerated. He brought this suit under 42 U.S.C. § 1983, alleging Stateville's medical provider Wexford Health Sources, Inc. and two of its physicians were deliberately indifferent to his serious foot condition because they prioritized cost concerns above

reasoned medical judgment. The district court granted summary judgment to the defendants, and we now affirm.

## I. Background

### A. Factual Background

Rodney Clemons has been incarcerated at Illinois's Stateville Correctional Center ("Stateville") since 2005. Wexford Health Sources, Inc. ("Wexford") provides health care at Stateville on a contractual basis.

Years before his incarceration, Clemons injured his right ankle, requiring surgery to install a steel plate and six screws. While incarcerated at Stateville, Clemons reported pain in his right foot and ankle. When medical professionals examined the extremity, they noted a range of problems, including a flat, deformed foot, overlapping toes, bunions, and skin maceration. Over time, these problems worsened—ultimately requiring corrective surgery.

By way of quick summary: Dr. Saleh Obaisi, Wexford's medical director at Stateville from 2012 until his death in 2017, began treating Clemons in 2012. Continuing the course of treatment ordered by prior medical professionals, Dr. Obaisi frequently ordered Clemons special wide-width shoes. He also prescribed Clemons pain medications and issued him permits for a low bunk, medical shoes, and an ankle brace.

Up until 2015, Wexford approved the shoe orders. But in September 2015, Wexford denied one such order. In lieu of the shoes, Wexford instructed Clemons to use gel insoles with commissary shoes, despite those shoes' past failure to alleviate his pain. Clemons complained to Dr. Obaisi that the insoles were ineffective, but Dr. Obaisi did not appeal the denial. Instead, he prescribed Clemons different pain

medication and, later, an ankle sleeve. In June 2016, Dr. Obaisi again ordered Clemons wide-width shoes. Wexford (again) denied the order. And Dr. Obaisi (again) did not appeal.

In a sworn affidavit submitted in response to the defendants' motion for summary judgment, Clemons averred that Dr. Obaisi informed him that cost concerns were to blame for Wexford's denial of the shoe orders. He further attested that, during multiple appointments, he requested a podiatrist referral. Dr. Obaisi allegedly "agreed that [Clemons] needed to see a podiatrist for [his] condition, but [Dr. Obaisi] explained to [Clemons] that he could not send [Clemons] to see a specialist at that time because he was at or approaching his limit for referrals to outside specialists." Clemons declared:

> Dr. Obaisi told me that there was a limit to the number of prisoners who could be sent out of the prison to see specialists in a certain period of time; and that if he were to send me, it would cost additional money. He told me that if I came back to him in a few months, the referral period would reset, and he would request that I be sent out to see a podiatrist.

Each time Clemons returned, Dr. Obaisi allegedly refused to make a referral, citing the same reason. This pattern repeated well into 2017.

Notably, Dr. Obaisi's 2014–2015 performance review from Wexford indicated that he "did not meet expectations" as to "cost effectiveness," even though he rated himself as having "far exceeded" expectations. It stated Obaisi "fell short with financial obligations in the area of offsite care and pharmacy," in which he was "drastically over budget." His performance review the following year reached a similar conclusion.

Dr. Obaisi finally referred Clemons to a podiatrist in March 2017 after x-rays of Clemons's foot showed its condition deteriorating. Clemons saw the podiatrist in November of that year. The podiatrist recommended an ankle sleeve, a "gym-shoe type orthopedic," and custom accommodative orthopedic shoe inserts to treat Clemons's condition. Following these recommendations, Dr. Obaisi ordered the shoe inserts and a follow-up appointment.

After Dr. Obaisi passed away in December 2017, Clemons continued receiving treatment from other Wexford medical professionals. In the course of this treatment, Clemons yet again faced repeated denials of requests for wide-width shoes and follow-up appointments with the podiatrist.

In November 2018, Dr. Marlene Henze—Dr. Obaisi's successor—began treating Clemons. Dr. Henze also repeatedly ordered wide-width shoes and podiatry follow-ups, and also met Wexford's denials. Dr. Henze appealed one denial in March 2019, and a few months later Wexford approved the podiatry follow-up, custom shoes, and custom inserts.

Clemons ultimately needed corrective surgery, which he received in January 2020.

## B. Procedural Background

Clemons brought this action against Dr. Obaisi's estate; Dr. Arthur Funk, Wexford's Regional Medical Director; and Wexford (collectively, the "defendants"), alleging that their deliberate indifference to his serious medical needs violated the Eighth Amendment. After discovery, the defendants moved for summary judgment, and the district court granted the motion as to all defendants.

As to Dr. Obaisi, the district court concluded that, despite his statement that the referral limit prevented him from referring Clemons to a podiatrist, the treatment plan he ultimately adopted was reasonable. It also found that Dr. Obaisi's failure to appeal Wexford's shoe-order denials did not establish deliberate indifference. As to Wexford, the court concluded that without any evidence of a widespread pattern of indifference, a jury could not infer deliberate indifference rising to the level of a constitutional violation.

Clemons appeals.

## II. Analysis

Clemons argues the district court erred in granting summary judgment to Dr. Obaisi and Wexford.[*] We review the district court's decision de novo, construing all facts and drawing all reasonable inferences in Clemons's favor. *Prude v. Meli*, 76 F.4th 648, 656 (7th Cir. 2023). We will affirm summary judgment if there is no genuine dispute of material fact and "the movant is entitled to judgment as a matter of law." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011).

### A. Sham Affidavit

Before turning to the merits of Clemons's arguments, we consider the defendants' contention that we should disregard Clemons's affidavit as a "sham affidavit."

The sham-affidavit rule "prohibits a party from submitting an affidavit that contradicts the party's prior deposition

---

[*] Clemons does not appeal the district court's decision to grant summary judgment to Dr. Funk.

or other sworn testimony." *Kelley v. Stevanovich*, 40 F.4th 779, 787 (7th Cir. 2022) (quoting *Perez v. Staples Cont. & Com. LLC*, 31 F.4th 560, 569 (7th Cir. 2022)). "The rule 'is designed to avoid sham factual issues and prevent parties from taking back concessions that later prove ill-advised.'" *United States v. Funds in the Amount of $271,080*, 816 F.3d 903, 907 (7th Cir. 2016) (quoting *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 750–51 (7th Cir. 2010)). In other words, the rule reflects the principle that "a *genuine* issue of material fact cannot be conjured out of nothing." *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). We review the district court's evidentiary ruling on the affidavit's admissibility for abuse of discretion. *Id.* at 314.

As we have warned, the sham-affidavit rule "must be applied with great care … because summary judgment is not a tool for deciding questions of credibility." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 571 (7th Cir. 2015). Accordingly, "an affidavit can be excluded as a sham only where the witness has given 'clear answers to unambiguous questions which negate the existence of any genuine issue of material fact.'" *Id.* at 572 (quoting *Bank of Ill. v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1170 (7th Cir. 1996)).

Defendants argue Clemons's affidavit—submitted only after they filed their motion for summary judgment—created for the first time a dispute of fact as to the core issue of this case: whether Dr. Obaisi was deliberately indifferent for adjusting his plan of treatment purely for cost reasons and contrary to his reasoned medical opinion.

We see no abuse of discretion in the district court's decision to consider the affidavit. It found Clemons's affidavit did not conjure up an otherwise nonexistent dispute of fact or contradict his deposition testimony; rather, it simply built

upon facts already in the record—without contradicting or undoing the effects of those allegations. The sham-affidavit rule is simply inapplicable where the affidavit amplifies, rather than contradicts, evidence already in the record. *See Cook v. O'Neill*, 803 F.3d 296, 298 (7th Cir. 2015). Although Clemons's affidavit is questionable, the district court did not abuse its discretion in finding that the allegations simply elaborated on his prior factual allegations.

**B. Dr. Obaisi**

On the merits, we start with Clemons's claims against Dr. Obaisi's estate. "The Eighth Amendment's ban on 'cruel and unusual punishments' obligates prison officials to provide medical care to prisoners in their custody." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 234 (7th Cir. 2021). Accordingly, a prison official's "[d]eliberate indifference to serious medical needs of prisoners" violates the Eighth Amendment. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 661–62 (7th Cir. 2016). To evaluate such a claim in the prison medical context, "we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016).

The first step—whether Clemons suffered from an objectively serious medical condition—is not in dispute. This leaves only the second step: whether Dr. Obaisi was deliberately indifferent. To show deliberate indifference, Clemons must show that Dr. Obaisi knew of and "consciously disregarded a serious risk to his health." *Dean*, 18 F.4th at 241 (citing *Petties*, 836 F.3d at 728). We look to Dr. Obaisi's "subjective

state of mind" to assess whether Clemons made such a showing. *Petties*, 836 F.3d at 728.

Where, as here, "a prison medical professional is accused of providing *inadequate* treatment (in contrast to *no* treatment), evaluating the subjective state-of-mind element can be difficult." *Whiting*, 839 F.3d at 662. "[W]here the evidence shows that a decision was based on medical judgment, a jury may not find deliberate indifference, even if other professionals would have handled the situation differently." *Dean*, 18 F.4th at 241. Evidence of medical negligence, a mistake in professional judgment, or even objective recklessness is not enough. *See id.*; *Whiting*, 839 F.3d at 662. But "where evidence exists that the defendants knew better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to [the] risk of the harm that they caused." *Petties*, 836 F.3d at 730–31. Such evidence may include "the obviousness of the risk from a particular course of medical treatment; the defendant's persistence in a course of treatment known to be ineffective; or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards." *Whiting*, 839 F.3d at 663 (citations and quotations omitted).

Clemons posits two ways in which Dr. Obaisi was deliberately indifferent to his medical needs: (1) acknowledging Clemons's medical need to see a podiatrist but delaying the podiatrist referral for cost-saving reasons, and (2) failing to appeal Wexford's denial of the wide-width shoe orders. We consider each in turn.

### 1. Delaying Podiatrist Referral

"A prison physician is not required to authorize a visit to a specialist in order to render constitutionally acceptable medical care." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014). "Like other medical decisions, the choice whether to refer a prisoner to a specialist involves the exercise of medical discretion, and so refusal to refer supports a claim of deliberate indifference only if that choice is blatantly inappropriate." *Id.* (citations and quotations omitted). Nevertheless, where "the need for specialized expertise either was known by the treating physicians or would have been obvious to a lay person, then the 'obdurate refusal' to engage specialists" may raise an inference as to whether the medical provider was deliberately indifferent to the inmate's condition. *Id.* at 412 (quoting *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005)).

To support his deliberate indifference theory, Clemons relies almost exclusively on Dr. Obaisi's alleged statement that Clemons "needed to see a specialist" for his condition, but that he could not refer Clemons at that time because he was "at or approaching his limit for referrals." Clemons argues this statement evinces both Dr. Obaisi's subjective medical judgment that Clemons needed specialist care and his deliberate indifference in prioritizing cost over that care.

Dr. Obaisi's other alleged statements to Clemons show that he was not "obdurate" in refusing to send Clemons to a podiatrist and refute any issue of fact on this issue. *Id.* Even Clemons claims that Dr. Obaisi told him that if he "came back to him in a few months, the referral period would reset," and Dr. Obaisi would then request a referral. In the meantime, Dr. Obaisi continued to reasonably treat Clemons, including ordering the wide-width shoes that Clemons stated "were

perfect" for managing his pain. This approach was not "blatantly inappropriate." *Id.* at 411.

Nor can we say the delay in referring Clemons to a podiatrist was deliberately indifferent. Where a physician delays "in referring an inmate to a specialist in the face of a known need for specialist treatment," that delay may reflect deliberate indifference. *Thomas v. Martija*, 991 F.3d 763, 769 (7th Cir. 2021). But delay alone "is not enough." *Id.* "Whether delay rises to the level of deliberate indifference depends on how serious the condition is and the ease of treatment." *Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022). "[E]vidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Id.* (quoting *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022)).

Here, the record reveals Dr. Obaisi responded reasonably in treating Clemons's foot condition—even with the delay. Dr. Obaisi continued providing Clemons with other treatments during the delay period, including wide-width shoes, a low bunk, an ankle brace, and different pain medications. And after x-rays showed Clemons's condition worsening, Dr. Obaisi referred him to a podiatrist in short order. The podiatrist thereafter recommended almost identical treatment—albeit with the addition of custom orthotics—to that ordered by Dr. Obaisi. Given this near-perfect symmetry, no reasonable jury could find Dr. Obaisi's treatment decisions so unacceptable that "no minimally competent professional would have so responded under those circumstances." *Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008) (cleaned up).

That Dr. Obaisi gave a cost-saving rationale for delaying the referral does not transform his exercise of reasonable

medical judgment into deliberate indifference. As we have repeatedly recognized, "administrative convenience and cost may be, in appropriate circumstances, permissible factors for correctional systems to consider in making treatment decisions," provided they do not consider these factors "to the exclusion of reasonable medical judgment about inmate health." *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011) (emphasis omitted); *see also Petties*, 836 F.3d at 730; *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006).

Here, no evidence supports the notion that Dr. Obaisi left his medical judgment by the wayside in treating Clemons's condition. We thus conclude no reasonable jury could find Dr. Obaisi deliberately indifferent to Clemons's medical need to see a podiatrist.

### 2. Failure to Appeal Wexford's Denials

We can dispose of Clemons's next argument—that Dr. Obaisi was deliberately indifferent for failing to appeal Wexford's shoe-order denials—in short order. Clemons points to no decision finding a prison doctor deliberately indifferent for failing to appeal such administrative denials. We decline to reach such a novel conclusion on these facts.

This case is distinguishable from the line of cases recognizing that a medical professional's persistence in a course of treatment known to be ineffective can establish deliberate indifference. *See, e.g.*, *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020). Unlike those cases, the evidence here shows the treatments Dr. Obaisi ordered—wide-width shoes, an ankle brace, and more—*were* effectively managing Clemons's pain. That Wexford at times denied the wide-width shoes does not

render Dr. Obaisi's persistence in ordering this effective course of treatment deliberately indifferent.

Indeed, we rejected a similar argument in *Dean*, 18 F.4th at 243–44. There, an inmate argued a prison doctor was deliberately indifferent for failing to "follow up" on a recommended course of treatment when the prison staff tasked with implementing that recommendation disregarded it. *Id.* Clemons's argument here likewise "rests on the [faulty] assumption that, if [Dr. Obaisi] had followed up more [by appealing Wexford's denial]," Clemons would have received the wider shoes. *Id.* As in *Dean*, "[n]o evidence supports the inference that Dr. [Obaisi] could have changed the course of [Clemons's] treatment if [he] had been more persistent." *Id.* at 244.

True, after Dr. Obaisi's passing, Dr. Henze successfully appealed Wexford's denial of yet another shoe order. But that success years later does not mean failure to appeal at an earlier time rose to the level of deliberate indifference. Absent allegations that Dr. Obaisi was aware that appealing the denials would be effective, or that he had some control over the approval process, we cannot say Dr. Obaisi was deliberately indifferent for persistently reordering the shoes and allowing the prison's administrative process to run its course. *Cf. Arnett v. Webster*, 658 F.3d 742, 756 (7th Cir. 2011) (finding no evidence of deliberate indifference where the nonmedical prison staff member neither "condoned or approved the medical staff's alleged refusal to provide [the plaintiff] medical care … [n]or was in a position to take corrective action").

The district court properly granted summary judgment to Dr. Obaisi's estate.

## C. Wexford

Finally, we turn to Clemons's § 1983 claim against Wexford. A plaintiff may sue a municipality under § 1983 for constitutional violations. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). "*Monell* governs Wexford's liability in this case because we, like our sister circuits, treat private corporations acting under color of state law as municipalities." *Dean*, 18 F.4th at 235 (citing *Iskander v. Village of Forest Park*, 690 F.2d 126, 128 (7th Cir. 1982)).

"[A] *Monell* plaintiff must show that some municipal action directly caused him to suffer a deprivation of a federal right, and that the municipality took the action with conscious disregard for the known or obvious risk of the deprivation." *Id.* at 236. Municipal action can take the form of: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019).

Because Clemons cannot succeed on his claims against Dr. Obaisi or Dr. Funk, he must show that the "institutional policies are themselves deliberately indifferent to the quality of care provided." *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 568 (7th Cir. 2021) (quoting *Glisson v. Ind. Dep't of Corrs.*, 849 F.3d 372, 379 (7th Cir. 2017)). To that end, Clemons takes aim at Wexford's alleged unwritten, express policy of limiting referrals to trim costs.

Even assuming Clemons has raised a genuine issue of material fact as to this unwritten policy's existence, Clemons

must show either that the policy is "facially unconstitutional" or that "it was obvious [that the policy] would lead to constitutional violations and … [Wexford] consciously disregarded those consequences." *Dean*, 18 F.4th at 235 (quoting *First Midwest Bank ex rel. LaPorta v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)). He shows neither.

Clemons does not challenge the policy as facially unconstitutional. Nor could he. As we have said, "in the prison setting with limited resources," *Petties*, 836 F.3d at 730, administrative convenience and cost—when considered in tandem with reasonable medical judgment—are appropriate inputs in making treatment decisions, *Roe*, 631 F.3d at 863. The alleged policy here merely places an advisory limit on referrals. That nonmandatory policy could well work in tandem with medical judgment, encouraging doctors to prioritize referrals for those who urgently need them over referrals for less needy patients.

Clemons nevertheless contends that the policy violates the Eighth Amendment when enforced—specifically, when enforced against him. Yet we require "considerably more proof than [a] single incident" to establish the requisite fault of a municipality and the causal connection between the policy and the constitutional deprivation. *Dean*, 18 F.4th at 236 (emphasis omitted) (quoting *City of Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985) (plurality)). As such, a *Monell* plaintiff must show a pattern of prior violations to "creat[e] an inference that municipal officials were aware of and condoned the misconduct of their employees." *Id.* at 237 (quoting *Calderone v. City of Chicago*, 979 F.3d 1156, 1164 (7th Cir. 2020)). As the district court observed, Clemons fails to identify any instances—

apart from his own—where prison officials have applied the policy.

Nor is this one of the "rare cases" in which "the risk of unconstitutional consequences" from the policy is "so patently obvious that [Wexford] could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 236 (cleaned up). Nothing suggests the policy prevents medical professionals from exercising reasonable medical judgment and addressing patients' serious medical needs as they arise.

Clemons fails to show the pattern of violations our caselaw requires. Thus, the district court properly granted Wexford summary judgment.

*        *        *

The judgment of the district court is

AFFIRMED.