In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 19-2440

MICHAEL RECK,

*Plaintiff-Appellant*,

*v.*

WEXFORD HEALTH SOURCES,
INC., et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Southern District of Illinois.
No. 3:16-cv-01141-RJD — **Reona J. Daly**, *Magistrate Judge*.

_____

ARGUED OCTOBER 28, 2021 — DECIDED FEBRUARY 23, 2022

_____

Before RIPPLE, HAMILTON, and SCUDDER, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Michael Reck, a prisoner at Menard Correctional Center ("Menard"), an institution in the Illinois Department of Corrections ("the Department"), filed this Section 1983 action against a prison physician ("Dr. Trost"), the Health Care Unit Administrator ("Administrator Walls"), a prison nurse ("Nurse Smith"), and Wexford Health Sources, Inc. ("Wexford"), the entity that provides

medical services to inmates under a contract with the Department. In his complaint, Mr. Reck alleged that the defendants had violated the Eighth Amendment through their deliberate indifference to his serious medical condition. In due course, the defendants moved for summary judgment. The district court granted the motion and then entered judgment.[1] Mr. Reck timely appealed.[2] For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A.

#### 1.

We begin with an examination of the general medical care arrangement at Menard during the relevant time period. With respect to the administration of medical care, this institution identifies as a "blended site" because both Wexford and Illinois Department of Corrections employees serve on the medical staff. Wexford employs the physicians and nurse practitioners; both Wexford and the Illinois Department of Corrections employ nurses. A prisoner may seek medical attention by making his need known to any staff

---

[1] The district court had jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1343. All parties consented to proceed before a magistrate judge. *See* 28 U.S.C. § 636(c)(1).

[2] *See* 28 U.S.C. § 1291. Mr. Reck initially appeared pro se, and his appeal was set for decision without oral argument under Rule 34. The panel later decided to appoint counsel and to set the case for oral argument.

member.[3] However, because Menard is a maximum security prison, the inmates' freedom of movement within the institution is limited. Consequently, in seeking medical care, inmates also may submit written requests for medical care; these requests are known as "sick calls" or "kites." There are several acceptable ways for an inmate to submit a kite. He may drop it into a locked box in each cell house, leave them in the cell bars for prison employees to collect, or give it to medical staff.

A nurse collects the kites from the locked boxes daily, logs them, and then reviews them. Menard's policy requires that kites be reviewed daily and that a health care professional evaluate an inmate within seventy-two hours of a request for medical assistance. This timeframe was not always achieved. According to the record, there were several reasons for this lapse: understaffing in the Health Care Unit; loss of sick call requests; failure to pick up requests; and nurses' ignoring sick call requests.

During the relevant period, Menard's Health Care Unit was understaffed. There were days when a physician was not available. Inmates were frequently unable to see medical staff promptly.

Dr. Trost's personal attendance record reveals excessive absences. There were days when Dr. Trost did not report to work or left early. Dr. Trost himself agreed and testified that

---

[3] Administrator Walls testified that inmates may contact "any employee, doesn't even have to be a nurse, [and] tell them they have an issue, they'll call over to health care, and they could see them." R.151-9 at 103:23–25.

he "can see where [his unscheduled departures] would po-
tentially contribute to" "creat[ing] additional backlog and
delay[ing] treatments provided to patients."[4] He was placed
on a corrective action plan. Shortly before Mr. Reck's medi-
cal troubles began, Dr. Trost became the only physician at
Menard. The other physician left, and the sole nurse practi-
tioner took an extended medical leave, not returning until
after April 2016.

**2.**

We now turn to a rendition of Mr. Reck's medical diffi-
culties and his interaction with the medical program at Wex-
ford.

In 2015, Mr. Reck developed a "painful perianal abscess
with recurrent bloody discharge" because of his Crohn's dis-
ease, which previously had been in remission.[5] His condition
caused him considerable pain throughout 2015.

He submitted sick call kites by leaving them in his cell
bars for prison employees to pick up when collecting the
mail. He submitted kites on July 10, July 14, July 19, August
10, August 18, September 14, September 20, October 16, Oc-
tober 25, October 31, November 14, 2015, and January 14,
2016.[6] Medical personnel did not see Mr. Reck in response to

---

[4] R.151-3 at 75:13–75:21.

[5] R.151-13 at 2.

[6] Details of these sick call requests are set forth in the following text
when necessary to our analysis. Suffice it to say that Mr. Reck's fistula
caused him considerable pain throughout 2015.

those sick call requests. There is, however, no evidence that the medical staff received these kites; the record contains only the contemporaneous copies that Mr. Reck made. Mr. Reck also documented these requests in his journal. He testified that he also made numerous oral requests to Menard staff members.

The record shows evidence that medical personnel received a sick call request from Mr. Reck on July 26, 2015, and that medical personnel saw Mr. Reck on the following day. Specifically, on July 27, 2015, a nurse saw him and noted in the log that Mr. Reck would be referred to a physician. Mr. Reck did not see a physician, however, until September 1, 2015. The parties dispute whether this encounter was because of the July 26 referral or because of an emergency.[7]

On September 1, Mr. Reck's abscess burst. The discharged blood soaked through his undergarments and his shorts to his bed sheets. A prison employee took Mr. Reck to the Health Care Unit where Dr. Trost examined him. During that examination, Dr. Trost noted that Mr. Reck had an ab-

---

[7] Administrator Walls blamed the delay on a "computer glitch." R.153-2 at 5. Several other medical encounters took place during this period. They appear, however, to be related only indirectly to Mr. Reck's Crohn's disease. On July 27, Mr. Reck was seen by a nonparty social worker in his cell (due to a lockdown). Mr. Reck told the social worker he would be "'ok' until he can get pulled out to be seen." R.151-1 at 133. On the 28th, a nonparty nurse drew his blood. Two days later, a nonparty mental health employee observed Mr. Reck's appearance during group therapy. On August 6, 2015, Mr. Reck took a tuberculosis test. On August 31, 2015, Mr. Reck told a nonparty social worker that he was "'alright' but could be better" and that he needed medical attention. R.151-1 at 135; *see also* R.153-2 at 7–8.

normal connection between two hollow spaces—known as a "fistula"—on his left buttock. The fistula had been there for about a month. Dr. Trost also documented that Mr. Reck previously had undergone surgery to remove a fistula. Mr. Reck also had taken Humira in 2011 before his Crohn's went into remission.

Dr. Trost prescribed Levaquin, an antibiotic, and Pentasa, an anti-inflammatory. He also ordered a follow-up in one month's time. Mr. Reck further testified that Dr. Trost promised to refer him to a G.I. specialist.

Mr. Reck's abscess burst again on the following day. He was outside when blood began to run down his leg, and a correctional officer brought him to the Health Care Unit. Mr. Reck told Nurse Smith that the abscess was "leaking now."[8] Nurse Smith noted an alteration in skin integrity but did not otherwise examine Mr. Reck; nor did she refer him to a physician. Instead, she relied on Dr. Trost's examination from the previous day. She instructed Mr. Reck to keep the area clean and dry, and she provided Mr. Reck with gauze and bandages. She gave him nothing for the pain.

Mr. Reck passed out when his abscess burst for a third time on September 12, 2015. He was brought to the Health Care Unit, where a nonparty nurse tended to him, noted a "beefy red" open area measuring one centimeter by one centimeter, and told him to keep the area clean and dry.[9]

---

[8] R.151-1 at 6.

[9] R.151-1 at 7.

Two days later, Mr. Reck submitted another sick call request to see Dr. Trost for his bloody stool, bursting abscess, and severe pain. When Nurse Smith saw him three days later, on September 17, 2015, she noted that Mr. Reck complained of constant bleeding but failed to examine Mr. Reck. Mr. Reck told Nurse Smith that he "need[ed] to have surgery on this."[10] She again provided him with gauze.

Mr. Reck's abscess burst again on September 20, 2015. He suffered severe pain and notified a nonparty correctional officer. On September 24, 2015, a nonparty nurse saw him and noted that the abscess had "drained" "white stuff" and observed a boil the size of a nickel.[11] Despite instructions that a physician referral is required for draining or for signs of cellulitis, the nurse did not make a referral. The nurse did not note active draining and concluded that it looked "like a healed boil."[12]

Mr. Reck filed a grievance on September 23, 2015, complaining of his repeated unanswered medical care requests. In her deposition testimony, Administrator Walls noted that Mr. Reck had experienced a "lengthy" delay but blamed it on a "computer glitch."[13] She said that Mr. Reck had been "treated as medically deemed necessary."[14] Administra-

---

[10] *Id.* at 9.

[11] *Id.* at 10.

[12] *Id.*

[13] R.153-2 at 5; R.151-9 at 184:6–23; 190:8–192:9.

[14] R.153-2 at 5.

tor Walls did not mention Mr. Reck's sick call requests submitted through the bars, nor did she review Menard policies or procedures or speak with medical personnel about Mr. Reck's grievances.

On September 27, 2015, Mr. Reck was scheduled to see a doctor through the physician call line, but the nonparty physician did not show up.

Dr. Trost saw Mr. Reck again on October 2, 2015. He did not examine Mr. Reck. He noted: "[F]istula persists. Last colonoscopy 2012. Humira 2011. *No improvement*."[15] He referred Mr. Reck to a gastrointestinal specialist and requested a colonoscopy. He did not make a surgery referral at that time. Dr. Trost continued the same course of treatment that he had prescribed at the earlier encounter by continuing the same antibiotic and the same anti-inflammatory. He further authorized a ninety-day supply of ibuprofen.

On November 2, 2015, Mr. Reck was back in the Health Care Unit. He complained of pain and "[c]ont[inual] rectal bleeding."[16] Nurse Smith saw him but did not examine him and did not consult a physician. Two days later, a prison employee brought Mr. Reck to the Health Care Unit again for "[s]ubstantial bleeding."[17] Dr. Trost prescribed a third round of antibiotics; Mr. Reck also received disposable diapers.

---

[15] R.151-1 at 12 (emphasis added).

[16] *Id.* at 15.

[17] R.151-10 at 6.

On November 6, 2015, Mr. Reck underwent a colonoscopy. Ten days later, he had his two-year physical exam with a nonparty physician. Mr. Reck told the doctor about the bleeding from his buttock and his pain, which he described as an 8 on a scale of 1 to 10.

Mr. Reck complained of pain to a nonparty nurse on November 16, 2015, and on November 24, 2015, Mr. Reck saw a nonparty medical employee for a colonoscopy follow-up. Three biopsies had been done; one revealed "focal active colitis" in the rectum, which is "consistent with focal mildly active Crohn's disease."[18] The report described the colonoscopy results as "grossly normal."[19]

Mr. Reck saw the gastrointestinal specialist on December 24, 2015, the first available appointment. This physician confirmed that Mr. Reck had Crohn's disease and a rectal fistula. He recommended that Mr. Reck receive Humira, to which Mr. Reck had responded favorably in 2011 (the last time his Crohn's was active). The specialist also recommended that Mr. Reck be referred to a surgeon. Dr. Trost followed up by recommending that Mr. Reck be referred to surgery, and the consultation was approved by Wexford after collegial review on January 8, 2016. His Humira injections were approved on January 10, 2016.

Mr. Reck was scheduled for a visit on the physician call line on January 11, 2016, but no physician was present. He was rescheduled for January 17 to renew his medication, but

---

[18] R.151-1 at 40.

[19] *Id.* at 33.

the line ran out of time, and he was not seen on that date either.

The surgery consult occurred on January 28, 2016. The surgeon noted: "The patient is a known case of Crohn's disease for over 10 years … . The patient states that he has had perianal abscesses and fistulae in the past, and has had various surgical procedures including seton placement, fistulotomy, fistula plug, and anorectal flap in the past."[20] A rectal examination revealed "irregularity and scarring within the anal canal."[21] The surgeon concluded that Mr. Reck needed an examination under anesthesia with a possible stitch placed and possible cavity drainage. Dr. Trost referred Mr. Reck to surgery on February 2, 2016. Mr. Reck underwent surgery on February 9, 2016. The procedure was successful.

**B.**

Mr. Reck filed his Section 1983 complaint on October 17, 2016. He alleged that Wexford, Dr. Trost, Nurse Smith, an Unknown Medical Director, and three other individuals had been deliberately indifferent to his serious medical needs.

The district court appointed counsel for Mr. Reck and allowed him to amend his complaint, but limited the complaint to the following counts:

> **Count 1**–Eighth Amendment deliberate indifference claim against Wexford, Walls, and

---

[20] *Id.* at 126.

[21] *Id.* at 129.

Trost for implementing, monitoring, and over-seeing an ineffective sick call system;

**Count 2**–Eighth Amendment deliberate indifference claim against Wexford, Walls, and Trost for understaffing and failing to fill necessary positions within the prison medical system;

**Count 4**–Eighth Amendment deliberate indifference claim against Wexford, Trost, and Smith for failure to place plaintiff in the chronic care clinic and on an individualized treatment plan;

**Count 5**–Eighth Amendment deliberate indifference claim against Dr. Trost for delaying his referral of [Mr. Reck] to a GI specialist despite having diagnosed the need for such referral[.][22]

Dr. Hellerstein, the expert Mr. Reck retained for the litigation, testified in his deposition that Dr. Trost's care was reasonable until October 2, 2015. On that date, his care became inadequate. "Dr. Trost should have examined Mr. Reck to determine the severity and urgency of his abscess/fistula before starting yet another round of the same antibiotic which had previously failed to resolve these problems."[23] In Dr. Hellerstein's view, "[i]t should have been apparent to Dr. Trost that conservative treatment for Mr. Reck's ab-

---

[22] R.112 at 7–8. Certain individuals named in the earlier iterations of the complaint were dismissed from the litigation.

[23] R.151-13 at 5.

scess/fistula had failed, would continue to fail, and that he needed surgical intervention."[24] Dr. Hellerstein also testified that Nurse Smith's treatment of Mr. Reck, including her repeated failure to examine him, fell below the standard of care. He testified that the decisions regarding Mr. Reck's care should not have been made by a registered nurse "and required prompt consultation with a provider, or an urgent referral."[25]

Wexford's expert, Dr. Gage, testified to the contrary. Dr. Gage testified that both Dr. Trost's and Nurse Smith's treatments were reasonable. In her view, Dr. Trost's conservative treatment seemed to have worked because Mr. Reck was improving by late December 2015. She believed the fistula healed naturally. Nurse Smith also was reasonable, in Dr. Gage's view. The symptoms Mr. Reck presented to Nurse Smith were the natural healing course of a fistula, and thus there was no need for Nurse Smith to examine Mr. Reck.

The district court granted summary judgment for the defendants. It concluded that Mr. Reck had a serious medical condition but that no defendant had been deliberately indifferent in addressing that condition. With respect to Mr. Reck's medical care requests from July and August 2015, the court determined that there was no evidence that Administrator Walls or Dr. Trost were aware of those requests. In the court's view, the record contained no evidence that

---

[24] *Id.*

[25] *Id.*

the medical staff had received Mr. Reck's sick call requests. Turning to the understaffing situation at Menard, the court found no evidence that the situation had harmed Mr. Reck or that Dr. Trost or Administrator Walls could have hired additional medical workers. Evaluating Dr. Trost's care of Mr. Reck, the court could find no evidence that Dr. Trost's absences or his failure to repeatedly examine Mr. Reck or to make an earlier referral to a GI specialist had had an adverse effect on Mr. Reck. Likewise, the court could ascertain no harm from Nurse Smith's failure to examine Mr. Reck. Because no Wexford employee was held to have violated the Constitution, Wexford itself could not be liable.

Mr. Reck timely appealed and initially appeared pro se; we set his appeal for decision under Rule 34. The panel decided, however, to appoint counsel and to set the case for oral argument.

## II

## DISCUSSION

Mr. Reck makes three discrete arguments. First, he says that Dr. Trost and Nurse Smith exhibited deliberate indifference in their treatment of him. Second, he maintains that Administrator Walls and Wexford operated an unconstitutionally ineffective sick call system. Finally, he posits that Administrator Walls, Dr. Trost, and Wexford were responsible for unconstitutional understaffing of the Health Care Unit. We will address each in turn.

### A.

We first turn to Mr. Reck's case against Dr. Trost. In essence, Mr. Reck submits that Dr. Trost was deliberately indifferent when he persisted in pursuing a course of treat-

ment known to be ineffective and in failing to refer Mr. Reck to a specialist and a surgeon more promptly.[26] The principles that must guide our evaluation of Mr. Reck's contentions are well-established in our case law. A prison official violates the Eighth Amendment by acting with subjective "deliberate indifference" to an inmate's "objectively serious" medical condition. *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000).[27] Deliberate indifference requires something more than negligence or even medical malpractice; "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). "[S]omething akin to recklessness" is needed. *Arnett v. Webster*, 658 F.3d 742, 751 (7th Cir. 2011).

Doggedly persisting in an ineffective treatment can establish deliberate indifference. In *Greeno v. Daley*, 414 F.3d 645, 654–55 (7th Cir. 2005), we reversed a grant of summary judgment where the defendants repeatedly persisted in offering weak medication despite the inmate's protests that the medicine was not working. Explaining *Greeno*, we have underscored that "when a doctor is aware of the need to undertake a specific task and fails to do so, the case for deliberate

---

[26] Dr. Trost claims that Mr. Reck casts his argument in a manner that exceeds the bounds of the order granting leave to file a second amended complaint. Dr. Trost waived this argument by failing to object at the summary judgment stage. "[A]rguments not raised to the district court are waived on appeal." *Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012).

[27] No one disputes that Mr. Reck's Crohn's disease and anal fistula constituted a serious medical need. *See* Trost & Wexford Br. 25; Smith & Walls Br. 16 (arguing only that they were not deliberately indifferent).

indifference is particularly strong." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020).

We also must consider the patient's pain. "A delay in treating non-life-threatening but painful conditions may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." *Arnett*, 658 F.3d at 753. Whether delay rises to the level of deliberate indifference depends on how serious the condition is and the ease of treatment. *Compare Goodloe*, 947 F.3d at 1031–32 (holding that a three-month delay in referring an inmate to an outside specialist could establish deliberate indifference where the inmate was in substantial pain), *with Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1997) (affirming dismissal where inmate waited six days to see a doctor for an infected cyst). But "[e]vidence that the defendant responded reasonably to the risk, even if he was ultimately unsuccessful in preventing the harm, negates an assertion of deliberate indifference." *Rasho v. Jeffreys*, 22 F.4th 703, 710 (7th Cir. 2022).

Mr. Reck asks us to consider that he first complained of his worsening conditions due to the abscess in July of 2015. Despite his efforts, he did not see Dr. Trost until September 1, 2015, about eight weeks after his initial complaint. By that time, the abscess had burst. Although Dr. Trost told Mr. Reck that he would refer him to a gastrointestinal specialist, he did not make the referral until October 2. Meanwhile the abscess continued to burst open and caused Mr. Reck considerable pain and restricted significantly his daily movements.

On October 2, Dr. Trost made a referral to a gastrointestinal specialist. This decision, Mr. Reck submits, was not in

accord with the established standard of care. Relying principally on the report of his expert, Dr. Hellerstein, Mr. Reck maintains that, at his appointment with Dr. Trost on October 1, it was clear that the previously prescribed conservative regime of antibiotics had been ineffectual and that his condition, including his persistent pain, required a referral to a specialist *and* a surgeon. Continuing minimal, ineffective medical intervention, he submits, does not fulfill the institution's responsibilities. He points out that he returned to the clinic frequently in search of assistance to alleviate the condition and the accompanying pain, but that no effort was made to alter his medication, even though his records noted that he had responded well to the biological Humira.

Dr. Trost takes a different view of the matter. In his view, the record reveals a steady and appropriate management of Mr. Reck's condition within the limitations imposed by the prison system's review procedures. He notes that, in his first encounter with Mr. Reck on September 1, he treated his patient with an anti-inflammatory (Pentasa) and an antibiotic (Levaquin). He also scheduled a one-month follow-up. He denies making any sort of promise of referral to a specialist on that occasion.[28]

Mr. Reck's own expert admits that Dr. Trost's course of treatment was reasonable prior to October 2, 2015. On Octo-

---

[28] Dr. Trost's testimony in this regard differs from Mr. Reck's version, but we do not believe that whether Dr. Trost promised a surgical referral at the September meeting creates a genuine issue of triable fact. What Dr. Trost promised is not the appropriate focus in evaluating Mr. Reck's contention. Rather, we must focus on what kind of care Dr. Trost actually gave during the relevant period.

ber 2, Dr. Trost determined that Mr. Reck's condition had not improved. He initiated the necessary process to arrange a colonoscopy. That request was approved on October 8, and this procedure was performed on November 6. After the October 2 encounter, Dr. Trost also initiated the process to secure a consultation with a gastroenterologist. He presented Mr. Reck's case to a review board on October 29. The Board approved the consultation on November 4, and an appointment with the specialist was made for December 24, the first available appointment. The gastroenterologist recommended a referral to a general surgeon. That referral was approved and made in early January. A surgeon examined Mr. Reck on January 28, and the recommended procedure was carried out on February 9. No medical witness said that a fistula or an abscess was discovered during that procedure.

The main point of disagreement between the medical experts is whether Dr. Trost should have referred Mr. Reck directly to a surgeon on October 2 when he realized that his initial conservative treatment with antibiotics had been ineffectual.[29] We therefore must examine carefully Dr. Trost's treatment decision in light of the deliberate-indifference principles we have articulated. Delay, especially when it implicates a worsening of the patient's condition or prolonged and unnecessary pain can constitute, under some circumstances, a violation of the Eighth Amendment. Here, Dr. Hellerstein opined that he would have made the surgical refer-

---

[29] Dr. Hellerstein testified that Dr. Trost's failure on October 2 to order a surgery consult fell below the standard of care. R.151-13 at 8 ("When Dr. Trost saw Mr. Reck on October 2, it was apparent that Mr. Reck had failed conservative treatment.").

ral on that date, but, notably, he could point to no harm to Mr. Reck as a result of Dr. Trost's decision. Dr. Gage testified that she would have decided upon the same progression of treatment as Dr. Trost. No doubt, we must consider the persistence of pain during the last quarter of the year, but, as Dr. Gage testified, the countervailing pain of surgery must be weighed by a physician in determining a course of treatment.

The record reveals no support for an Eighth Amendment violation. It shows, at most, a disagreement among physicians which does, not, without more, establish the necessary reckless disregard for patient harm and pain required for a constitutional violation. Beginning on October 2, Dr. Trost took the steps necessary to obtain approval of the review board to secure Mr. Reck further treatment. The necessity of the colonoscopy and the consultation with a gastroenterologist may be debatable among physicians, but these steps hardly demonstrate a reckless disregard for Mr. Reck's well-being. We do not see here any indication that Dr. Trost ignored the gravity of Mr. Reck's condition or "slow-walked" his treatment plan.

Nor can we say that Dr. Trost's pharmaceutical management of Mr. Reck's condition while awaiting surgery constituted reckless disregard for Mr. Reck's medical well-being. After the initial pharmaceutical intervention failed during September, Dr. Trost prescribed on October 2 a fourteen-day regimen of Levaquin and Ibuprofen, 800 mg three times a day as needed. There is no evidence in this record that would allow a reasonable jury to conclude that Dr. Trost acted in a reckless manner in prescribing medications while awaiting consultations with specialists.

The district court properly concluded that Dr. Trost's course of treatment of Mr. Reck's medical condition will not support an Eighth Amendment claim.

## B.

We turn now to Mr. Reck's submission that Nurse Smith violated the Eighth Amendment by acting with deliberate indifference in her medical encounters with Mr. Reck.[30]

The same basic principles that governed Mr. Reck's claim against Dr. Trost apply to this claim. We have noted, however, that it is important to take into account the role that the nurse plays in the care of a patient. As a general matter, a nurse can, and indeed must, defer to a treating physician's instructions. *See Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 682 (7th Cir. 2012); *see also McCann v. Ogle Cnty.*, 909 F.3d 881, 887 (7th Cir. 2018). However, that deference cannot be "blind or unthinking." *Berry v. Peterman*, 604 F.3d 435, 443

---

[30] We note that Mr. Reck has altered his argument on appeal. In his complaint and at summary judgment, he contended that Nurse Smith had acted with deliberate indifference by failing to place Mr. Reck in the chronic care clinic and on an individualized treatment plan. Now, he argues that Nurse Smith acted with deliberate indifference by failing to examine him or by failing to refer him to a physician. *See* Appellant's Br. 48.

Arguments not raised in the district court are waived. *Puffer*, 675 F.3d at 718. But Nurse Smith does not raise the waiver issue in her appeal brief, and a waiver argument can be waived. *United States v. Morgan*, 384 F.3d 439, 443 (7th Cir. 2004); *United States v. Adigun*, 703 F.3d 1014, 1022 (7th Cir. 2012) ("An opposing party can 'waive waiver' if it fails to assert the preclusive effect of the waiver before the appellate court.").

(7th Cir. 2010).[31] Under some circumstances when a nurse is aware of an inmate's pain and the ineffectiveness of the medications, a delay in advising the attending physician or in initiating treatment may support a claim of deliberate indifference. *Id.* "Nurses, like physicians, may thus be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (citation omitted).

The district court correctly concluded that a reasonable jury could not find that Nurse Smith was deliberately indifferent to Mr. Reck's medical condition. She treated Mr. Reck on two occasions during September 2015, on the 2nd and the 17th, before he was seen again by Dr. Trost on October 2. During both encounters, she neither examined Mr. Reck nor consulted a physician. Although the two expert witnesses disagreed as to whether Nurse Smith's care was professionally appropriate, there is no support for a finding that her approach was deliberately indifferent.

---

[31] In *Berry*, we reversed a grant of summary judgment where the nurse responded to the inmate's complaints of dental pain and ineffective medication for six weeks between the last time the doctor saw the inmate and the inmate being transferred to a new facility. *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010). That six-week period was a "substantial passage of time" that could allow a jury to "conclude that [the nurse] acted independently rather than on [the doctor's] instructions and was therefore personally responsible for delaying" the inmate's treatment. *Id.* In brief, nurses "have an independent duty to ensure that inmates receive constitutionally adequate care." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015).

Mr. Reck's expert, Dr. Hellerstein, stated in his report that, for a patient suffering from the same symptoms as Mr. Reck was suffering in 2015,[32] the "[m]anagement decision making" is "beyond the scope of a Registered Nurse, and required prompt consultation with a provider, or an urgent referral."[33] In Dr. Hellerstein's view, requiring Mr. Reck to wait two-and-a-half weeks for an appointment with a physician fell "below the standard of care."[34] This testimony, if accepted by a trier of fact, might support a determination that Nurse Smith was negligent, but it cannot support a conclusion that she was deliberately indifferent. Her first clinical encounter with Mr. Reck was immediately after his visit with Dr. Trost. At that visit, Dr. Trost had set in place a particular treatment plan for Mr. Reck's future care, including the administration of an anti-inflammatory and an antibiotic. Adhering to Dr. Trost's patient plan while ensuring that Mr. Reck had the necessary bandages to address the discharge hardly amounts to deliberate indifference. In her second clinical encounter with Mr. Reck later in the month, she was confronted with Mr. Reck's complaints that his fistula had burst several times, causing "blood [to run] down his legs," and causing him "extreme" and "debilitating" pain—pain so extreme that he "could not sit down," pain "so in-

---

[32] I.e., "a patient with Crohn's disease[,] … recurrent drainage[,] and increasing pain making walking and sitting extremely painful despite a recent course of antibiotics." R.151-13 at 5.

[33] *Id.*

[34] *Id.*

tense that [he] passed out."[35] In response to these complaints, Nurse Smith continued to adhere to Dr. Trost's treatment plan and provided him with gauze and band-aids to alleviate his immediate issues. Simply adhering to the medication regime prescribed by Dr. Trost and ensuring that Mr. Reck had adequate supplies of medication and bandages may not have been the optimal course to follow in light of Mr. Reck's complaints of pain, but, because her deference to Dr. Trost was not blind or unthinking, her conduct does not exhibit deliberate indifference.[36]

As in the case of Dr. Trost, our task here is not to determine whether Nurse Smith acted consistently with the highest standards of the nursing profession or even whether her conduct might be deemed negligent. Our sole task is to determine whether a reasonable finder of fact could determine that she was deliberately indifferent. The district court correctly determined that no such finding reasonably could be made on this record.

## C.

Administrator Walls was the Health Care Unit Administrator. She is a nurse and was, during the relevant time period, an employee of the Illinois Department of Corrections. Where the medical director would oversee the inmate care, she handled the policy and administration of the Health Care Unit. She also monitored Wexford's compliance with

---

[35] R.153-2 at 3–4, 7–8.

[36] We note that Mr. Reck was scheduled to see Dr. Trost shortly after this encounter, one month after the September 1 visit.

the contract. She oversaw Department medical employees, but she "did not personally deliver any medical care" or "have any administrative authority over any Wexford employees."[37] She also lacked "authority to hire, discipline, or terminate" Department or Wexford employees.[38] She served, along with Dr. Trost, on the Quality Improvement Committee.

Mr. Reck submits that Administrator Walls acted with deliberate indifference by ignoring his sick call requests during the summer months of 2015. Mr. Reck contends that he submitted several kites "through the bars" during this period and that they went unanswered. Had the Health Care Unit properly responded to these kites, continues Mr. Reck, his condition would have been treated earlier, and he would not have endured much of the pain that he experienced.

Administrator Walls frankly testified that there was a greater chance that a kite would be lost if the inmate chose to place it in the bars, as opposed to employing one of the other available methods.[39] She did not testify, however, as to the frequency of loss with the "through the bars" method. Nor does Mr. Reck point to any other evidence that Administrator Walls was aware that the frequency of loss was so high as to make this method of submission unacceptable absent substantial reform through her intervention.

---

[37] R.153-1 at 1.

[38] *Id.*

[39] *See* R.151-9 at 179:23–180:10.

Under these circumstances, it is clear that the district court properly granted summary judgment to Administrator Walls. A reasonable trier of fact could not conclude that she recklessly failed to improve or discontinue an ineffective notification system.

**D.**

Mr. Reck also maintains that Wexford violated the Eighth Amendment by failing to collect and to respond to requests for medical care. In *Glisson v. Indiana Department of Corrections*, 849 F.3d 372, 379 (7th Cir. 2017) (en banc), we set forth how a plaintiff can establish such liability against a corporate entity[40] such as Wexford:

> The critical question under *Monell*, reaffirmed in *Los Angeles [County] v. Humphries*, is whether a municipal (or corporate) policy or custom gave rise to the harm (that is, caused it), or if instead the harm resulted from the acts of the entity's agents. There are several ways in which a plaintiff might prove this essential element. First, she might show that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."

---

[40] We questioned in *Shields v. Illinois Department of Corrections*, whether private corporations might also be subject to *respondeat superior* liability, unlike their public counterparts, *see* 746 F.3d 782, 790–92 (7th Cir. 2014), but we have no need in the present case to address that question, and we therefore leave it for another day.

> Second, she might prove that the "constitu-tional deprivation was visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Third, the plaintiff might be able to show that a government's policy or custom is "made ... by those whose edicts or acts may fairly be said to represent official policy." As we put the point in one case, "a person who wants to impose liability on a municipality for a constitutional tort must show that the tort was committed (that is, authorized or directed) at the policymaking level of government ... ." Either the content of an official policy, a deci-sion by a final decisionmaker, or evidence of custom will suffice.

*Id.* (cleaned up) (internal citations omitted).

"[E]vidence of a widespread practice of failing to review inmates' timely filed medical requests" can support a delib-erate indifference charge against the entity responsible for reviewing the requests. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010).[41] An entity "faced with ac-

---

[41] In *Thomas*, the inmate presented evidence that the medical requests were not timely retrieved from the lockboxes in which the inmates de-posited them. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303–04 (7th Cir. 2010). Several prison employees were aware of this practice and knew the dangers of not answering medical requests promptly. *Id.* This unofficial custom led to the death of the inmate where prompt retrieval

(continued ... )

tual or constructive knowledge that its agents will probably violate constitutional rights, … may not adopt a policy of inaction." *King v. Kramer*, 680 F.3d 1013, 1021 (7th Cir. 2012) (quoting *Warren v. District of Columbia*, 353 F.3d 36, 39 (D.C. Cir. 2004)). Isolated acts of individual employees, however, are not actionable; something more is required to establish a widespread custom or practice for *Monell* liability. *Thomas*, 604 F.3d at 303. When a plaintiff relies on a widespread practice to establish an entity's liability, "proof of isolated acts of misconduct will not suffice; a series of violations must be presented to lay the premise of deliberate indifference." *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir. 2003).

Here, Mr. Reck has submitted evidence that medical personnel took no action on a significant number of his kites. These medical requests are supported by Mr. Reck's testimony, his contemporaneous copies of the sick call requests, and his journal entries. There was no evidence, however, that medical personnel received, with one exception, these requests.[42] The logs of the medical department do not indicate that these requests were ever received.

---

( … continued)

of the medical request forms would have alerted medical staff to the inmate's condition. *Id.* at 304.

[42] The record contains the following unanswered sick call requests from Mr. Reck:

- July 10, 2015—Mr. Reck first complained about Crohn's and fistulas. R.151-2 at 19:19–22, 41:21–42:2.

(continued … )

( … continued)

- July 14, 2015—Mr. Reck complained to the medical technician drawing his blood about his need for medical help. *Id.* at 99:9–100:23.

- July 14, 2015—Mr. Reck submitted another sick call request. *Id.* at 110:1–16.

- July 19, 2015—Mr. Reck submitted another sick call request. *Id.*

- July 28, 2015—Mr. Reck again complained to the medical technician drawing his blood. *Id.* at 101:6–23.

- August 10, 2015—Mr. Reck submitted another sick call request. *Id.* at 110:1–16.

- August 18, 2015—Mr. Reck submitted another sick call request. *Id.*

- August 25, 2015—Mr. Reck sent a kite to his counselor requesting information about his medical issues. *Id.* at 110:21–111:4.

- Throughout this time Mr. Reck also verbally told other medical health professionals, including medication nurses and his counselor, of his need for assistance. *Id.* at 84:1–12.

- September 1, 2015—Mr. Reck was finally seen by Dr. Trost in the Health Care Unit in response to an emergency. R.153-2 at 7–8.

The prison defendants admit to receiving one sick call request from Mr. Reck dated July 26, 2015. They say that Mr. Reck was scheduled to be seen in response to this request, but an "uncommon" "computer glitch" caused Mr. Reck to not be seen for that request. Trost & Wexford Br. 29. Either way, there is no evidence that this single incident was the act of a policymaking official or "so persistent and widespread as to

(continued … )

Because this case comes to us in summary judgment posture, we must accept Mr. Reck's testimony and evidence that he submitted these requests and that he made some requests directly to medical staff. Mr. Reck is also correct in maintaining that his chosen method of submission, through the cell bars, was an authorized method of making such requests. However, if Wexford's medical personnel never received these requests, it is difficult to fault them, or Wexford, for not having replied.

There is, however, a more fundamental defect in Mr. Reck's case. There is no evidence that Wexford, or any of its employees, had responsibility for the design, monitoring, or maintenance of the system of transmitting a prisoner's request through the bars. The documentation to which Mr. Reck invites our attention simply does not address that matter. Without some showing that Wexford had such responsibility, we cannot impose on it liability for the system's alleged malfunction.

**E.**

Mr. Reck's next contention is that Dr. Trost, Administrator Walls, and Wexford were deliberately indifferent to his medical needs through a practice of chronically understaffing the Health Care Unit. Deficiencies in staffing and delays in treatment can give rise to a deliberate indifference claim. *Wellman v. Faulkner*, 715 F.2d 269, 274 (7th Cir. 1983). "As a

---

( … continued)

practically have the force of law," and thus *Monell* liability cannot attach. *See Connick v. Thompson*, 563 U.S. 51, 61 (2011).

practical matter, 'deliberate indifference' … can be demonstrated by 'proving there are such systemic and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care.'" *Id.* at 272 (quoting *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)). Where a rule or regulation is required to correct a known dangerous custom or practice, a public entity's failure to institute corrective policy is actionable. *Thomas*, 604 F.3d at 303.

The magistrate judge found that Administrator Walls, Dr. Trost, and Wexford were aware of the staffing issues but also found neither Administrator Walls nor Dr. Trost had the authority to fill the vacancies. If they cannot hire more doctors, they cannot be responsible for the lack of doctors. Dr. Trost might have been negligent in his duties, but a mere failure to attend to one's responsibilities, without more, does not reach the level of deliberate indifference the Constitution prohibits.

Moreover, there is no evidence that the understaffing harmed Mr. Reck. Prior to September 1, 2015, Mr. Reck was not scheduled to see medical personnel, so lack of available personnel cannot have harmed him. From September 1 to October 2, the care Mr. Reck was receiving was, according to his own expert, reasonable and thus cannot serve as the basis for a deliberate indifference claim.

After October 2, Mr. Reck raises two potential instances when he was harmed by understaffing: (1) On January 11, 2016, he was scheduled on the physician call line but was not seen because no physician was present. That nonparty doctor was absent due to a scheduling conflict, and Mr. Reck was recalled for the following week. There is no evidence

Dr. Lochard's scheduling conflict was caused by Administrator Walls, Dr. Trost, or Wexford. (2) Mr. Reck was scheduled on the physician call line on January 17, 2016, for a renewal of his medicines. He was not seen because the call line ran out of time. However, his medications were renewed two days later, and he was seen by a physician on January 24. There is no evidence that the call line ran out of time due to understaffing, a physician shortage, or because of Dr. Trost's absenteeism. Nor can we say on this record that having his medication renewal delayed by two days effectively denied Mr. Reck medical care.

For these reasons the district court did not err in granting summary judgment on the understaffing claim.

## Conclusion

In the end, the district court correctly determined that the defendants are entitled to summary judgment. Accordingly, its judgment is affirmed.

AFFIRMED

HAMILTON, *Circuit Judge*, concurring. Plaintiff Reck has offered evidence of appalling medical care—and a dysfunctional health care system at Menard. He suffered severe avoidable pain for months before he finally received the surgery he needed. As demonstrated in Judge Ripple's opinion, however, Reck's Eighth Amendment claims are blocked by current precedents under 42 U.S.C. § 1983 that focus primarily on individual liability of prison officials and medical staff, and that set a high bar for Wexford's corporate liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Judge Ripple's opinion carefully applies controlling Supreme Court and Seventh Circuit precedent to the evidence in this record. I therefore join his opinion.

But we should not lose sight of the larger picture. Existing precedents encourage private companies that provide health care in prisons to set up labyrinthine procedures and organizational structures that save money by delaying and denying needed medical care for prisoners while also diffusing responsibility so widely that no individual can be held legally responsible for avoidable suffering. See *Hildreth v. Butler*, 960 F.3d 420, 432–41 (7th Cir. 2020) (Hamilton, J., dissenting). I have explained in an earlier panel opinion why private corporations like Wexford should not benefit from the *Monell* policy, custom, or practice standard and should instead be subject to respondeat superior liability in § 1983 cases. *Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 789–96 (7th Cir. 2014). I will not repeat that discussion here except to note that Supreme Court precedents do not require lower federal courts to extend the benefits of *Monell* to such private corporations. The circuit precedents on the question are overdue for a careful reexamination.