NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with FED. R. APP. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted August 31, 2022[*]
Decided August 31, 2022

*Before*

FRANK H. EASTERBROOK, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

CANDACE JACKSON-AKIWUMI, *Circuit Judge*

No. 20-3533

| | |
|---|---|
| JIMMIE D. MILLER, *Plaintiff-Appellant*, | Appeal from the United States District Court for the Southern District of Illinois. |
| *v.* | No. 3:17-CV-859-MAB |
| WEXFORD HEALTH SOURCES, INC., et al., *Defendants-Appellees*. | Mark A. Beatty, *Magistrate Judge*. |

**O R D E R**

Jimmie Miller, a former Illinois inmate, appeals from the summary judgment on his claims that medical providers and prison officials violated his rights under the Eighth Amendment by ignoring his hepatitis, diabetes, mental health, and vision issues.

---

[*] We have agreed to decide the case without oral argument because the briefs and record adequately present the facts and legal arguments, and oral argument would not significantly aid the court. FED. R. APP. P. 34(a)(2)(C).

The district court correctly concluded that no reasonable jury could find that any defendant deliberately ignored these four matters; therefore, we affirm.

In reviewing the summary judgment against him, we view the facts about the treatment of Miller's four conditions in the light most favorable to him. *Henry v. Hulett*, 969 F.3d 769, 774 (7th Cir. 2020) (en banc). His treatment occurred at Pinckneyville Correctional Center, where he was imprisoned from September 2016 to early 2019. (He was released from a different prison in 2020.)

The first condition is hepatitis. Miller was diagnosed with Hepatitis C before his incarceration, and he was enrolled at Pinckneyville's chronic-care clinic upon arrival at the prison in 2016. Soon after, he met with a nurse practitioner who performed tests and found that a measure of Miller's fibrosis of the liver was 0.71. In 2015, Pinckneyville adopted a policy (which Miller does not contest) authorizing therapy for Hepatitis C only if an inmate's fibrosis measure was over 1.0. Based on Miller's score, the nurse practitioner told him that he did not qualify for Hepatitis C therapy, but that he should continue visiting the chronic-care clinic for monitoring. Miller asked the nurse practitioner for the Hepatitis A and B vaccinations at that visit, and she told him to "drop a request slip." (Miller eventually received the vaccines four years later.) While Miller was imprisoned at Pinckneyville, his providers continued to monitor his fibrosis score. It never rose above 1.0; he therefore never received Hepatitis C therapy.

Miller also has Type II diabetes, and he received treatment for it from two doctors. Miller visited one doctor after arriving at the prison and reported intermittent pain in his lower left side. A chest x-ray and lab tests of his urine and kidneys yielded normal results, and the doctor concluded that Miller's pain was likely caused by musculoskeletal issues. Miller's blood glucose levels, though, were elevated, suggesting to the doctor that Miller's diabetes had not been "well controlled." The doctor therefore prescribed insulin for his diabetes and enrolled him in the diabetes clinic, where a pair of doctors monitored his blood glucose levels, which remained elevated. In response, the doctors told Miller to maintain a well-balanced diet, and they recommended nutritional adjustments. Months later, Miller told one of the doctors about increased urination, dry mouth, and thirst. The doctor raised Miller's insulin dosage, adjusted other drugs, and prescribed a low-sugar insulin snack to supplement the prison's regular meals, which a nutritionist said included options for diabetics.

Miller also experiences mental-health problems. He was on anti-psychotic drugs for bipolar disorder when he arrived at Pinckneyville. Shortly after his intake in 2016,

Miller met with a psychiatrist who concluded that he was then "mentally stable" and recommended that he discontinue the anti-psychotic medication (advice that Miller accepted). Miller did not return to that psychiatrist for a follow-up exam, but he met with a mental-health counselor. The counselor noted that Miller was coherent and cooperative; she nonetheless recommended individual and group therapy, to which Miller agreed. Later, when Miller reported feeling anxious in his stomach, the counselor discussed coping skills with him. By December 2016, Miller asked the counselor to restore his bipolar medicine. Because she did not have the credentials to prescribe medication, she referred him to a psychiatrist. Miller eventually met with a psychiatrist and resumed medication in July 2017.

The final medical issue concerns Miller's vision. He wears eyeglasses, and he asserts that they fell off during a fight in his cell shortly after he arrived in 2016. While a nurse evaluated him after the fight, Miller reports that he encountered the warden and asked her to retrieve his glasses from the floor of his cell. She responded that she would "look into it," but never followed up. (The warden denies agreeing to retrieve his glasses.) Miller spent a month in segregation and when he returned to his cell, his glasses were missing. About nine months later, an optometrist replaced his glasses.

Miller sent grievances and letters to prison officials about these issues. In particular, in June 2017 Miller filed an emergency grievance regarding his medical care. The grievance officer processed it, consulted with an administrator who reviewed Miller's medical records, and verified that he was receiving treatment for his conditions. On that basis, the grievance was denied. Miller also sent letters to administrators such as the acting director and medical directors of the Illinois Department of Corrections, complaining about what he considered to be inadequate responses to his grievances. He received no replies to these letters. He also tried to hand a grievance to a correctional counselor, but she declined to take it and told him to place it in the grievance box.

Miller next turned to federal court for relief, suing medical staff, grievance officials, and administrators under the Eighth Amendment. *See* 42 U.S.C. § 1983. The district court entered summary judgment for three medical officers on the ground that Miller had not exhausted administrative remedies for claims against them. With the parties' consent, a magistrate judge conducted all remaining proceedings. In entering summary judgment for the defendants, the magistrate judge reasoned that Miller's medical providers had undisputedly complied with the uncontested guideline for Hepatitis C therapy by watching his fibrosis level (which stayed below the cutoff for intervention). Likewise, they had adequately treated his diabetes, side pain, and mental

health, because Miller did not rebut the evidence that they provided appropriate exams, therapy, clinic access, and dietary adjustments. Next the court ruled that the missing eyeglasses did not present a serious medical issue. Finally, the court addressed the claims against the grievance officers and administrators. It ruled that no reasonable jury could conclude that they deliberately ignored Miller's health, because they reasonably investigated grievances and properly deferred to his providers' medical judgment.

On appeal, Miller challenges these rulings. To survive summary judgment on his Eighth Amendment claims, he must supply evidence that can persuade a reasonable jury that the defendants recklessly disregarded a substantial risk of serious harm to his health. *See Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). In considering whether Miller's medical providers deliberately ignored his health, we examine the totality of his medical care. *See Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Courts defer to a medical professional's treatment decisions unless no minimally competent professional would have responded the same way. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

With respect to his hepatitis, Miller has not met his burden to avoid summary judgment. It is undisputed that, upon his arrival at the prison, his doctors enrolled him in a specialized clinic for hepatitis and followed the prison's uncontested protocol of monitoring his fibrosis score and ordering further treatment only if the score exceeded 1.0 (which it never did). Miller responds that he did not receive the vaccines for Hepatitis A and B as quickly as he would have preferred. But he has not furnished evidence, as he must, that he suffered from either condition or was harmed by the delay. *See Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 483 (7th Cir. 2022).

Regarding Miller's diabetes, his doctors also provided treatment compatible with the Eighth Amendment. It is undisputed that they enrolled him in a specialized clinic for diabetes, prescribed medication such as insulin, monitored his glucose levels, and recommended dietary adjustments. Miller replies that his doctors did not require the prison to provide him with meals tailored to his diabetes or address the pain in his side that he once reported. But Miller has not presented evidence that the prison's regular meals, which a nutritionist testified included options for diabetics, were inappropriate for him. And when Miller complained of pain in his lower left side, his doctor ordered a chest x-ray and performed lab tests, both of which showed no abnormalities.

Likewise, a reasonable jury could not conclude that Miller's providers were deliberately indifferent to his mental-health issues. Miller does not dispute that the prison's psychiatrist evaluated him upon his arrival, and he supplied no evidence to

contradict that doctor's conclusion that Miller was stable and could discontinue his anti-psychotic medication (a plan to which Miller consented). Also, no medical evidence contradicts the professionalism of the judgment from the prison's counselor who offered individualized and group therapy for Miller, advised coping skills for him, and referred him to a psychiatrist when he wanted to resume medication. Miller responds that he wanted a different course of treatment, but he offers no evidence that the one he received was reckless.

Next, we address Miller's claim about his eyeglasses. He argues that the district court overlooked evidence that prison officials refused to return his missing glasses before he was taken to segregation and he could not see clearly for almost a year. But even if true, he has not demonstrated that the defendants exposed him to a known and serious risk of substantial harm. Miller has not pointed to medical records or other evidence illustrating the extent of his visual impairment without glasses, let alone to evidence that any defendant was aware of its severity and consciously disregarded it. *See Petties*, 836 F.3d at 728. Thus, even if the warden promised to "look into" his missing glasses and failed to do so, Miller has not demonstrated that she knew about and recklessly ignored a serious risk to his health. *See id.*

We now turn to Miller's claims against grievance officials. On appeal, he does not point to any evidence suggesting that these officials failed to process grievances that he properly filed; he contends only that the grievance officers should not have denied them. But the denial of a grievance is not by itself an Eighth Amendment violation. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). And before a grievance officer denied Miller's emergency grievance in 2017, he did so after consulting with the medical officials about Miller's care; the officer could rightly defer to that medical judgment. *See Eagan v. Dempsey*, 987 F.3d 667, 694 (7th Cir. 2021). Miller replies that other grievances were ignored rather than processed. But he does not supply evidence that he properly filed these other grievances, as he must in order to proceed on a claim that officers had to respond to them. *See Dole v. Chandler*, 438 F.3d 804, 808–09 (7th Cir. 2006). Miller also contends that a correctional counselor declined to accept one grievance by telling him to place it in the designated box. But no evidence suggests that Miller could not (or need not) do so, or that a grievance officer failed to review it.

Next, Miller tries to revive claims against prison administrators who did not respond to his mailings, complaining about how their subordinates handled his medical care and grievances. But administrators cannot be vicariously liable for failings of subordinates. *See Burks*, 555 F.3d at 593–94. In any event, as discussed above, Miller has

not shown that any subordinates violated his Eighth Amendment rights. *See Gill v. Cty. of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).

Finally, Miller challenges the finding that he failed to exhaust administrative remedies against three medical providers. But no evidence contradicts the court's finding that his grievances about these providers were either inexcusably untimely or not administratively appealed in the manner required under the Illinois Administrative Code. *See Pozo v. McCaughtry*, 286 F.3d 1022, 1024–25 (7th Cir. 2002).

Miller's other arguments are not developed and required no further discussion.

AFFIRMED